COOK COUNTY NATIONAL BANK v. UNITED STATES.

Section 3466 of the Revised Statutes, *infra*, p. 447, which, in certain cases therein mentioned, gives to the United States priority of payment of debts due to it, does not apply to its demands against an insolvent national bank.

APPEAL from the Circuit Court of the United States for the Northern District of Illinois.

This is an appeal from a decree of the Circuit Court overruling a general demurrer to a bill filed by the United States against the Cook County National Bank of Chicago, Ill., and Augustus H. Burley, its receiver. The facts, as stated in the bill, are briefly as follows : Previously to 1872, the bank was formed under the acts of Congress authorizing the organization of national banks, and was designated as a depositary of moneys of the United States. In January, 1875, it became insolvent, and suspended business. In February following, Burley was appointed by the Comptroller of the Currency its receiver, and he immediately entered upon the discharge of his duties.

At the time of its suspension, the bank had on deposit " of postal funds " $24,900, and of " money-order funds " $14,684, which are respectively designated on its books by those names. These moneys had been deposited with the bank by John McArthur, a deputy postmaster at Chicago.

The Treasury Department at the time held United States bonds, placed with it by the bank, to the amount of $150,000 par value, as security for all public moneys which might be deposited with the bank. These bonds were afterwards sold for $174,544.52. Of the proceeds, $155,305.47 were appropriated to pay the amount then on deposit with the bank to the credit of the Treasurer of the United States. Of the balance remaining, $11,803.98 were applied on the " postal funds," and $7,435.07 on the " money-order " funds, leaving still due on account of those two funds $20,344.95.

In addition to these bonds, there were at the time, in the Treasury Department, United States bonds to the amount of $100,000 par value, deposited by the bank to secure its notes issued for circulation. When, in 1875, the bank failed to pay these notes, the Comptroller of the Currency declared the bonds

forfeited to the United States. A part of them have been sold, and it is the intention of the Treasury Department to sell the remainder, and apply the proceeds to pay the notes in circulation, and reimburse the United States for sums already advanced for that purpose. The proceeds of all the bonds, when sold, will be sufficient to redeem the notes, reimburse the United States in full for their advances, and leave a balance exceeding $30,000, — more than sufficient to pay the debts due by the bank to the United States for " postal funds " and " money-order funds."

The Treasury Department, in addition to the bonds to secure the circulation of the notes, has a sum exceeding $30,000 belonging to the bank, collected from bills receivable and debts due to it; but its liabilities notwithstanding greatly exceed its assets.

Upon these facts the question arose whether the claim of the United States for moneys deposited by the deputy postmaster at Chicago is a preferred debt or not; and the officers of the United States are in doubt as to their duty on the subject, — that is, whether they should reserve from the funds in the Treasury Department belonging to the bank a sufficient amount to pay the debt for " postal funds " and " money-order funds " due to the United States, or whether they should distribute the said moneys *pro rata* to all the creditors of the bank, including the United States.

The bill prays that an account be taken of the amount due to the United States by the bank for moneys so deposited with it by the deputy postmaster, and that a decree be entered directing the disposition of the funds belonging to the bank in the control of the Treasury Department.

The defendants treated the bill as filed to obtain a decree adjudging to the United States a priority in the payment of their demand against the bank for the balance due on the postal and money-order funds, and interposed a general demurrer to it. The court, taking a similar view of the bill, overruled the demurrer. The defendants thereupon elected to stand by their demurrer, and as they at the same time admitted that the bank had a sufficient amount to pay the whole of the principal and interest due to the United States for the funds deposited

by the deputy postmaster as postal funds, and as money-order funds, the court ordered that the amount thus due should be paid in full out of the assets of the bank.   From this decree the appeal was taken.

The case was argued by *Mr. Roscoe Conkling*, with whom was *Mr. Henry S. Monroe*, for the appellants, and by *Mr. William C. Goudy* for the appellee.

MR. JUSTICE FIELD, after stating the facts, delivered the opinion of the court.

The Revised Statutes, in sect. 3466, provide that "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

This section is substantially a copy of sect. 5 of the act of March 3, 1797, c. 20, entitled "An Act to provide more effectually for the settlement of accounts between the United States and receivers of public money."   Statutes passed before 1797 embody similar provisions, and also declare that parties who are sureties of insolvents may pay to the United States any balance due to them, and have the same priority in the payment of their demands out of the estates of such insolvents as the United States would have if no such payment were made.

The language of the section in the Revised Statutes is general and comprehensive in its terms, and applies to demands of the United States against any insolvent person living, or the estate of any insolvent person dead; and also to demands against any person who, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, and against any estate of an absconding, concealed, or absent debtor whose effects have been attached by process of law.

The question is whether, under this broad and general lan-

guage, the United States, having demands against an insolvent national bank, are entitled to priority of payment out of its assets over other creditors. The appellants contend that the statute refers to such insolvency as is determined by judicial decree, as under a bankrupt act, or is manifested by the debtor's voluntary assignment of his property, or by its attachment under process against him, as an absconding, concealed, or absent debtor, and that within this meaning the Cook County National Bank never became insolvent, and that, therefore, the provisions giving priority of payment to demands of the United States against insolvents do not apply.

From the view we take of the act authorizing the formation of national banks, it is unnecessary to consider whether or not this position is tenable. We consider that act as constituting by itself a complete system for the establishment and government of national banks, prescribing the manner in which they may be formed, the amount of circulating notes they may issue, the security to be furnished for the redemption of those in circulation ; their obligations as depositaries of public moneys, and as such to furnish security for the deposits, and designating the consequences of their failure to redeem their notes, their liability to be placed in the hands of a receiver, and the manner, in such event, in which their affairs shall be wound up, their circulating notes redeemed, and other debts paid or their property applied towards such payment. Everything essential to the formation of the banks, the issue, security, and redemption of their notes, the winding up of the institutions, and the distribution of their effects, are fully provided for, as in a separate code by itself, neither limited nor enlarged by other statutory provisions with respect to the settlement of demands against insolvents or their estates.

In the first place, the banks are required to deposit with the Treasurer bonds of the United States as security for any notes that may be issued, the amount of which cannot in any case exceed ninety per cent of the par value of the bonds. Rev. Stat., sect. 5171. Should the market or the cash value of the bonds become reduced at any time below the amount of the notes issued, the Comptroller of the Currency may require that the amount of the depreciation be deposited with the

Treasurer in other United States bonds, or in money, so long
as such depreciation continues. Rev. Stat., sect. 5167. In case
of the refusal of a bank to pay its notes, the bonds may be sold
at public auction in the city of New York, and their proceeds
applied to reimburse the United States the amount expended
by them in paying the circulating notes; and for any deficiency
which may remain the United States are entitled to a para-
mount lien upon all the assets of the bank, which is to be paid
in preference to all other claims, except for costs and necessary
expenses in administering the same. Rev. Stat. sect. 5230.

In the second place, when the banks are made depositaries
of public moneys and employed as financial agents of the gov-
ernment, it is the duty of the Secretary of the Treasury to re-
quire them to give satisfactory security by the deposit of United
States bonds, or otherwise, for the safe-keeping and prompt
payment of the public money deposited, and for the faithful
performance of their duties as financial agents. The amount
of security which the Secretary may thus require has no limit
but his own judgment as to its necessity. Every officer of a
bank which is not an authorized depositary, and which has not
therefore given the required security, who knowingly receives
any public money on deposit, is liable for embezzlement. Rev.
Stat., sect. 5497. The government can thus always have se-
curity, limited in amount only by the judgment of the Secre-
tary of the Treasury, for public moneys deposited with any
national bank.

With these provisions for security against possible loss for
moneys deposited, it would seem only equitable that the gov-
ernment should call for such security, and, if it prove insuffi-
cient, take the position of other creditors in the distribution of
the assets of the bank in case of its failure. The framers of
the banking law evidently so regarded the matter. After pro-
viding for the appointment of a receiver by the Comptroller of
the Currency upon the suspension or failure of a bank, the law
requires the receiver to take possession of its books and records,
and assets of every description, and to collect all debts, dues,
and claims belonging to it; and authorizes him, upon an order
of a court of competent jurisdiction, to sell or compound bad
or doubtful debts; to sell the real or personal property of the

bank, and, if necessary, in order to pay its debts, to enforce the individual liability of its stockholders, and it directs him to pay over all moneys thus received to the Treasurer of the United States, subject to the order of the Comptroller of the Currency. It also requires the Comptroller, upon appointing a receiver, to cause notice to be published, calling upon all persons having claims against the bank to present the same, with legal proof thereof. It then declares as follows, in sect. 5236 : " From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the Comptroller shall make a ratable dividend of the money so paid over to him by such receiver, on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated ; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held.

This section provides for the distribution of the entire assets of the bank, giving no preference to any claim except for moneys to reimburse the United States for advances in redeeming the notes. When this reimbursement is fully provided for, the balance of the assets, as the proceeds are received, is subject to a ratable dividend on all claims proved to the satisfaction of the receiver, or adjudicated by a court of competent jurisdiction. Any sum remaining after the payment of all these claims is to be handed over to the stockholders in proportion to their respective shares. These provisions could not be carried out if the United States were entitled to priority in the payment of a demand not arising from advances to redeem the circulating notes. The balance, after reimbursement of the advances, could not be distributed, as directed, by a ratable dividend to all holders of claims ; that is, to all creditors.

These provisions must be deemed, therefore, to withdraw national banks, which have failed, from the class of insolvent persons out of whose estates demands of the United States are to be paid in preference to the claims of other creditors. The

law of 1797, re-enacted in the Revised Statutes, giving priority to the demands of the United States against insolvents, cannot be applied to demands against those institutions.    The provisions of that law and of the national banking law being, as applied to demands against national banks, inconsistent and repugnant, the former law must yield to the latter, and is, to the extent of the repugnancy, superseded by it.    The doctrine as to repugnant provisions of different laws is well settled, and has often been stated in decisions of this court.    A law embracing an entire subject, dealing with it in all its phases, may thus withdraw the subject from the operation of a general law as effectually as though, as to such subject, the general law were in terms repealed.    The question is one respecting the intention of the legislature.    And although as a general rule the United States are not bound by the provisions of a law in which they are not expressly mentioned, yet if a particular statute is clearly designed to prescribe the only rules which should govern the subject to which it relates, it will repeal any former one as to that subject.    *Daviess* v. *Fairbairn*, 3 How. 636 ;  *United States* v. *Tynen*, 11 Wall. 88.

In addition to these conflicting provisions in the banking law, necessarily superseding those of the law of 1797, as to the priority of the United States in the payment of their demands out of the estates of insolvents, there is the significant declaration of the banking law, that for any deficiency in the proceeds of the bonds deposited as security for the circulating notes of the bank the United States shall have a paramount lien upon all its assets, which shall be made good in preference to all other claims, except for costs and expenses in administering the same.    This declaration was unnecessary and quite superfluous if for such deficiency the United States already possessed, under the act of 1797, the right to be paid out of the assets of the bank in preference to the claims of other creditors. The declaration considered in connection with the ratable distribution of the assets, prescribed after such deficiency is provided for, is equivalent to a declaration that no other priority in the distribution of the proceeds of the assets is to be claimed.

This view of the banking law is not affected by the subsequent enactment in 1867 of the Bankrupt Act, giving priority

to the demands of the United States against the estates of bankrupts. That enactment was dealing with the estates of persons adjudged to be insolvent under that law, and covers only the distribution of their estates. It has no further reach.

It remains only to consider whether the United States have the right to claim the payment of this demand out of the surplus moneys remaining in the treasury of the proceeds of the bonds deposited as security for the circulating notes of the bank. The surplus is sufficient to pay the demand of the United States in full. Can the United States set off their demand against these proceeds? We have no hesitation in answering this question in the negative. The bonds were received in trust as a pledge for the payment of the circulating notes. The statute so declares in express terms. Rev. Stat., sects. 5162 and 5167. They were to be returned to the bank when the notes were paid, if not sold to reimburse the United States for moneys advanced to redeem the notes. The bank could have claimed their return at any time upon a surrender of the notes. The surplus constituted the assets of the bank, and part of the fund appropriated by the statute for its creditors. It was charged with this liability, and was held subject to it after the purposes of the original trust were accomplished, although remaining in the treasury. It was then subject to a new trust. A trustee cannot set off against the funds held by him in that character his individual demand against the grantor of the trust. Courts of equity and courts of law will not allow such an application of the funds so long as they are affected by any trust. It would open the door to all sorts of chicanery and fraud. The fund must be relieved from its trust character before it can be treated in any other character.

This doctrine is well illustrated in the case of *Sawyer* v. *Hoag*, 17 Wall. 611, 622. There a stockholder indebted to an insolvent corporation for unpaid shares undertook to set off against the claim upon him a debt due to him by the corporation. But it was held that this could not be done. Said the court, speaking by Mr. Justice Miller: " The debt which the appellant owed for his stock was a trust fund devoted to the payment of all the creditors of the company. As soon as the company became insolvent, and this fact became known to the

appellant, the right of set-off for an ordinary debt to its full amount ceased.   It became a fund belonging equally in equity to all the creditors, and could not be appropriated by the debtor to the exclusive payment of his own claim."

Here the surplus, being a fund for all the creditors, was subject to be distributed to them immediately upon the reimbursement of the advances of the United States, and the right of the creditors to it was not affected by the fact that it was at the time in the actual possession of the Treasury Department.

Nor is the relation of the United States to this fund changed by the forfeiture of the bonds, which the Comptroller of the Currency was authorized upon the failure of the bank to declare.   The forfeiture was not a confiscation of the bonds to the government.   It amounted only to an appropriation of them, against any other claim, to the specific purposes for which they had been deposited, authorizing their cancellation at market value when not above par, or their sale, so far as necessary to redeem the circulation or reimburse the United States for moneys advanced for that purpose.   When that purpose was accomplished, the bank had the right to any surplus of their proceeds, equally as though that right had been in express terms declared.

It follows from the views expressed that the decree of the court below must be reversed, and the cause be remanded with directions to sustain the demurrer and dismiss the bill; and it is

*So ordered.*