## UNITED STATES *v*. EMORY ET AL.

No. 33. Argued November 10, 1941.—Decided December 15, 1941.

*Mr. Melvin H. Siegel,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Shea,* and *Mr. Paul A. Sweeney* were on the brief, for the United States.

No appearance for respondents.

MR. JUSTICE BYRNES delivered the opinion of the Court.

This case involves the application of § 3466 of the Revised Statutes to a claim of the United States under the National Housing Act in an equity receivership proceeding in a state court.

The St. James Distillery, a corporation, executed a note to the Industrial Bank and Trust Company of St. Louis on September 23, 1935. On July 14, 1936, the Bank endorsed the note and delivered it to the Federal Housing Administration, acting on behalf of the United States, under a contract of insurance and guaranty provided for in Title I of the National Housing Act. The United States, through the Federal Housing Administration, on that date reimbursed the Bank in the amount of $5988.88, the balance due on the note. Emory, claiming wages due him, filed a petition on August 27, 1936 in the Circuit Court of Phelps County, Missouri, alleging that the St. James Distillery was hopelessly insolvent and praying that a receiver be appointed. On September 9, the Circuit Court found all the issues in Emory's favor and appointed a receiver who took possession of the corporate assets.

After deductions for the costs of the receivership, the assets available for distribution totaled $678. Against this amount the wage claims of "about twelve individuals" were filed. The separate amounts of these claims were neither stipulated nor determined by the courts below; their aggregate was "about $900." The United States, on behalf of the Federal Housing Administration, filed a claim for the $5988.88 due on the note. The wage claim-

ants asserted priority under § 1168 of the Revised Statutes of Missouri;[1] the United States asserted priority under § 3466 of the Revised Statutes of the United States.[2]

The Circuit Court of Phelps County decided that the claim of the United States should be treated as an ordinary claim against the estate, and that the wage claims should be paid first. On appeal, the Springfield Court of Appeals held that the claim of the United States on behalf of the Federal Housing Administration was accorded preference over ordinary claims by § 3466 of the Revised Statutes of the United States. Consequently, it was of the opinion that the Circuit Court had erred in treating the claim of the United States as an ordinary claim. However, it held further that the error was of no consequence, since the Missouri statute granted priority to wage claims even over other preferred claims and no assets would remain after they had been satisfied. Rehearing was denied, and

[1] Mo. Rev. Stat. (1929) § 1168, so far as pertinent, provides: "Hereafter when the property of any company, corporation, firm or person shall be seized upon by any process of any court of this state, or when their business shall be . .. . put into the hands of a receiver or trustee, then in all such cases the debts owing to laborers or servants, which have accrued by reason of their labor or employment, to an amount not exceeding one hundred dollars to each employee, for work or labor performed within six months next preceding the seizure or transfer of such property, . . . shall be first paid in full; and if there be not sufficient to pay them in full, then the same shall be paid to them pro rata, after paying the costs."

[2] U. S. Rev. Stat. § 3466 (U. S. C., Title 31, § 191) provides: "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

the Supreme Court of Missouri denied a petition for certiorari. We granted certiorari because of the importance of the question and because of an asserted conflict of decisions.

The applicability of § 3466 to this case is clear. The section applies in terms to cases "[1] in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or [2] in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, . . . [or] [3] in which an act of bankruptcy is committed." This case falls within the third category. It is agreed that the St. James Distillery was insolvent "on or before August 1936" and that in response to a creditor's petition a receiver was appointed to liquidate the corporate assets. The appointment of a receiver under such circumstances is among the most common examples of an "act of bankruptcy." *Cf.* § 3 (a) (4) of the Bankruptcy Act, U. S. C., Title 11, § 21 (a) (4).

Just such proceedings as this, therefore, are governed by the plain command of § 3466 that "debts due to the United States shall be first satisfied." The purpose of this section is "to secure adequate public revenues to sustain the public burden" (*United States* v. *State Bank of North Carolina,* 6 Pet. 29, 35), and it is to be construed liberally in order to effectuate that purpose (*Bramwell* v. *U. S. Fidelity & Guaranty Co.,* 269 U. S. 483, 487). In view of this language, purpose, and rule of construction, the priority asserted here by the United States appears to be securely established.

The court below, however, held otherwise. In granting priority to the wage claims over that of the United States, it relied upon Missouri law. It recognized, as the authorities obliged it to recognize,[3] that the state statute could

---

[3] *Field* v. *United States,* 9 Pet. 182, 200; *United States* v. *Oklahoma,* 261 U. S. 253; *Barnett* v. *American Surety Co.,* 77 F. 2d 225; *In re*

not prevail if it was in conflict with § 3466. But it decided that no such conflict arose, for the reason that § 3466 had been impliedly modified by § 64a of the Bankruptcy Act,[4] which, like the Missouri statute, requires that wage claims be satisfied before those of the United States.

The judgment below must have rested upon either of the following theories: that Congress intended by § 64a of the Bankruptcy Act to subordinate claims of the United States to wage claims in non-bankruptcy proceedings generally; or that Congress intended by § 64a to modify § 3466 only so far as to grant priority over the United States to wage claimants in state non-bankruptcy proceedings when they would be entitled to such priority by otherwise applicable state law.

There is a difficulty common to both theories which we regard as insurmountable. Neither the language of § 64a nor the Congressional history of the legislation here involved supports the proposition that § 64a was intended to eliminate, either partially or wholly, the priority of claims of the United States in non-bankruptcy proceedings.

_Dickson's Estate_, 197 Wash. 145, 154–155, 84 P. 2d 661. Cf. _United States_ v. _Summerlin_, 310 U. S. 414.

[4] Section 64a of the Bankruptcy Act, so far as pertinent, provides: "The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) . . . [costs of preserving the estate, etc.]; (2) wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; (3) . . . [certain expenses of creditors connected with the liquidation of the estate]; (4) taxes legally due and owing by the bankrupt to the United States or any State or any subdivision thereof . . .; and (5) debts owing to any person, including the United States, who by the laws of the United States is entitled to priority , , ,"

The provisions of § 3466 have been in force since 1797, without significant modifications. 1 Stat. 515. The first three federal bankruptcy acts [5] specifically preserved the priority of the United States over all other claimants in bankruptcy proceedings in the federal courts. Section 64 of the Bankruptcy Act of 1898,[6] however, disturbed this state of affairs. It provided an order of distribution of the assets of bankrupt estates in which certain wage claims preceded non-tax claims of the United States. While § 64 has been altered since 1898 in several particulars, the priority of wage claims over non-tax claims of the United States has continued. Consequently, we must look to the Act of 1898 for evidence that the priority accorded to wage claims by § 64 was intended to apply to more than bankruptcy proceedings in the federal courts.

We find no such evidence. The entire Act of 1898, as § 2 in particular plainly reveals, was designed to create federal courts of bankruptcy and to define their functions. Indeed, § 64 itself, in subdivision (a), refers to the "court"; § 1 provides that, as used in the Act, "court" means "the

---

[5] Act of 1800, c. 19, § 62, 2 Stat. 19; Act of 1841, c. 9, § 5, 5 Stat. 441; Act of 1867, c. 176, § 28, 14 Stat. 517.

[6] Section 64 of the Bankruptcy Act of 1898 (30 Stat. 544) provided:

"(a) The court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United States, State, county, district, or municipality in advance of the payment of dividends to creditors, and upon filing the receipts of the proper public officers for such payment he shall be credited with the amount thereof . . .

"(b) The debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the actual and necessary cost of preserving the estate subsequent to filing the petition; (2) the filing fees paid by creditors in involuntary cases; (3) . . . [the costs of administration]; (4) wages due to workmen, clerks, or servants which have been earned within three months before the date of the commencement of proceedings, not to exceed three hundred dollars to each claimant; and (5) debts owing to any person who by the laws of the States or the United States is entitled to priority."

court of bankruptcy in which the proceedings are pending"; and § 1 also provides that "courts of bankruptcy," as used in the Act, mean the federal district courts and a few other federal courts. There is no internal sign that any part of § 64 was intended to apply to state courts or to non-bankruptcy proceedings in the federal courts. We have looked in vain in the committee reports and the debate upon the bill for any external hint of such an intention.

It is not strange, therefore, that both courts and commentators have assumed that the application of § 64 of the Act of 1898 was limited to federal bankruptcy proceedings, and that the priority of claims of the United States in non-bankruptcy proceedings remained unaffected. *Bramwell* v. *U. S. Fidelity & Guaranty Co.,* 269 U. S. 483; *Price* v. *United States,* 269 U. S. 492; *Stripe* v. *United States,* 269 U. S. 503; *United States* v. *Butterworth-Judson,* 269 U. S. 504; *Mellon* v. *Michigan Trust Co.,* 271 U. S. 236, 238–239; *Spokane County* v. *United States,* 279 U. S. 80; *New York* v. *Maclay,* 288 U. S. 290. See Rogge, *The Differences in Priority of the United States in Bankruptcy and in Equity Receiverships,* 43 Harv. L. Rev. 251; Blair, *The Priority of the United States in Equity Receiverships,* 39 Harv. L. Rev. 1. We are aware of but a single case in which an appellate court has specifically passed upon the contention that the priority granted to the United States in non-bankruptcy proceedings by § 3466 has been modified by § 64 of the Bankruptcy Act. And in that case, the contention was rejected. *Matter of Kupshire Coats, Inc.,* 272 N. Y. 221, 5 N. E. 2d 715.[7]

While the point was not discussed in the courts below, it is now urged that the objectives and provisions of the National Housing Act require us to hold that claims of the

---

[7] A similar contention with respect to § 57j of the Bankruptcy Act was rejected in *Matter of Simpson, Inc.,* 258 App. Div. 148, 15 N. Y. S. 2d 1021.

United States arising under it are not entitled to the priority awarded by § 3466. We are aware of no canon of statutory construction compelling us to hold that the word "first" in a 150 year old statute means "second" or "third," unless Congress later has said so or implied it unmistakably.

Certainly, there is no provision in the National Housing Act expressly relinquishing the priority of the United States with respect to claims arising under it. At best, therefore, such an intention on the part of Congress must be found in some patent inconsistency between the purposes of the Housing Act and § 3466. The plain objective of the Housing Act was to stimulate the building trades and to increase employment. In order to induce banks and other lending institutions to get the program under way, Congress promised that the United States would make good up to 20% on the losses they might incur on such loans.[8] As between the Government and the lending institutions, it was clearly intended that the United States should bear the losses resulting from defaults. But beyond this we may not go. There is nothing to show a further intention that the United States should relinquish its priority as to claims against defaulting and insolvent borrowers whose notes it takes up from the lending institution pursuant to the insurance contract. That is, the ultimate collection of bad loans was consigned to the United States rather than to the lending institutions, but the collecting power of the United States was neither abridged nor qualified.[9]

We are told, however, that the broad purposes of the Act would be thwarted if we failed to assume that Con-

[8] 48 Stat. 1246, c. 847, § 2.

[9] The priority granted by § 3466 is, of course, no guaranty that the United States will be saved from loss. In the instant case, for example, the assets available for distribution are so small that the United States will lose heavily even if its claim is first satisfied.

gress intended to surrender this priority. The reason advanced is that suppliers of goods and services would refuse to extend credit to those desiring to make property improvements if they knew that in the event of insolvency their claims would be subordinated to those of the United States. The fatal weakness of this contention is that the Federal Housing Administration imposes an ironclad requirement that the proceeds of insured loans be used for no purpose other than the improvements described in the application for the loan.[10] Indeed, lending institutions frequently pay the proceeds of the loan directly to the suppliers of goods and services rather than to the property owner, and the practice has met with the enthusiastic approval of the Administration.[11]

Consequently, the argument against the application of § 3466 is reduced to this: Private persons in general are reluctant to extend credit when they know that in the event of the borrower's insolvency the claims of the United States will receive priority, and this circumstance is particularly undesirable in times of economic stress. In the first place, whatever may be the merits of the contention, it should be addressed to Congress and not to this Court. In the second place, the argument proves too much. If it is sound as applied to this kind of a claim of the United States, it is equally sound as applied to all claims as to which the United States asserts priority under § 3466.

Neither *Cook County National Bank* v. *United States,* 107 U. S. 445, nor *United States* v. *Guaranty Trust Co.,*

---

[10] "Modernization Credit Plan," Bulletin No. 1 (Aug. 10, 1934) pp. 15, 16–17; *id.* (Sept. 12, 1934 revision) p. 22; *id.* (July 15, 1935, revision) p. 19; *id.* (July 20, 1936 revision) pp. 6–7; "Property Improvement Loans Under Title I" (Feb. 4, 1938) pp. 4, 23; *id.* (July 1, 1939 revision) p. 15; *id.* (March 15, 1940 revision) p. 10.

[11] "Modernization Credit Plan," Bulletin No. 1 (Sept. 12, 1934 revision) p. 29; *id.* (July 15, 1935 revision) p. 15; "Property Improvement Loans Under Title I" (Feb. 4, 1938) p. 33; *id.* (July 1, 1939 revision) p. 30; *id.* (March 15, 1940 revision) regulation No. VIII.

280 U. S. 478, requires a different conclusion. In the former case, the United States was denied its § 3466 priority in connection with a claim against a national bank for the amount of certain funds of the United States deposited with it. The decision was based on two grounds. First, the National Banking Act undertook to provide a complete system for the establishment and government of banks, and it included specific provisions concerning the distribution of the assets of insolvent banks which were plainly inconsistent with the granting of priority to general claims of the United States. Second, the National Banking Act expressly authorized the Secretary of the Treasury to require national banks accepting deposits of federal funds to give satisfactory security; it was held to be fairly inferable that Congress intended the United States to look to this provision rather than to § 3466 for protection.

The claims which were denied priority in the *Guaranty Trust* case arose under Title II of the Transportation Act of 1920. That Act provided for the funding of debts to the United States which the railroads had contracted during the period of wartime control, and also provided for new loans to the railroads. In holding § 3466 inapplicable to the collection of these loans the Court emphasized that the basic purpose of the Act was to promote the general credit status of the railroads, that the railroads were required to furnish adequate security for the payment of both the old and new loans, and that the interest rate of 6% on one class of loans was "much greater than that which ordinarily accompanies even a business loan carrying such assurance of repayment as would have resulted from an application of the priority rule." 280 U. S. at 486. These factors persuaded the Court that Congress had intended to exclude these loans from the scope of § 3466.

In the instant case, none of these circumstances is present. The National Housing Act contains no refer-

ence to the liquidation of estates of insolvent borrowers, and consequently no direct inconsistency with § 3466 is possible. The purpose of Title I was not the strengthening of the *general* credit of property owners, but the stimulation of the building trades by affording assurances to lending institutions in order to induce them to make loans for property improvements. No security was required of the borrowers, and the interest charge was low.[12] Only the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466. We think such inconsistency is wholly wanting here.

Section 3466 is applicable to this proceeding, and it requires that the claim of the United States be first satisfied.

*Reversed.*

MR. JUSTICE REED, dissenting:

The purpose and provisions of the National Housing Act [1] lead me to the conclusion that § 3466 of the Revised

---

[12] Not until 1939, four years after the note in this case was executed, did the Federal Housing Administration even require the lending institutions to pay premiums for the insurance of Title I loans. 53 Stat. 805, c. 175, § 2. The income from these premiums was to be used primarily to meet operating expenses under Title I and secondarily to meet losses resulting from defaults. In his report dated April 1, 1941, the Administrator estimated that for the fiscal year ending June 30, 1941, this income from premiums would prove sufficient to reimburse the United States for less than half its losses under Title I, and that $4,000,000 of public funds would be required to meet the balance. Report of the Federal Housing Administration for the year ending Dec. 31, 1940, p. 11.

[1] Act of June 27, 1934, c. 847, Tit. I, § 2, 48 Stat. 1246, as amended 49 Stat. 299, 49 Stat. 722, 49 Stat. 1187, 49 Stat. 1234. The statute as thereafter amended subsequently to the events of this case may be found as 12 U. S. C. § 1703 (1940).

Statutes is inapplicable to the claim of the Administrator in this case.[2]

A statute is not to be interpreted by its text alone, as though it were a specimen under laboratory control. It takes meaning from other enactments forming the whole body of law bearing upon its subject.[3] If, like § 3466, it has been upon the books for years, the precedents interpreting its meaning must be considered in connection with it, particularly when, as here, new legislation is passed which may be inconsistent with its application.[4]

From past interpretation we learn that the traditional function of § 3466 is the assurance of the public revenue,[5] whatever may be the expense to the competing creditors. Their interests are subordinated to the general advantage.[6]

---

[2] Previous decisions in other courts concededly are to the contrary. *In re Long Island Sash & Door Corp.*, 259 App. Div. 688, 20 N. Y. S. 2d 573, aff'd mem. 284 N. Y. 713, 31 N. E. 2d 48, cert. den. 312 U. S. 696; *In re Dickson's Estate*, 197 Wash. 145, 84 P. 2d 661. Accord, *Korman* v. *Federal Housing Administrator*, 113 F. 2d 743 (App. D. C.); *Wagner* v. *McDonald*, 96 F. 2d 273 (C. C. A. 8th); *In re Weil*, 39 F. Supp. 618 (M. D. Pa.); *In re Wilson*, 23 F. Supp. 236 (N. D. Tex.); cf. *Federal Reserve Bank of Dallas* v. *Smylie*, 134 S. W. 2d 838 (Tex. Civ. App.) (Farm Credit Administration); see 52 Harv. L. Rev. 320. *United States* v. *Summerlin*, 310 U. S. 414, held only that the claim assigned to the administrator became a claim of the United States not subject to a state statute of "non-claim." It did not pass upon the right to priority under § 3466 in the decedent's estate. Compare *Dupont de Nemours & Co.* v. *Davis*, 264 U. S. 456, where the Director General of the railroads was held free from limitation, with *Mellon* v. *Michigan Trust Co.*, 271 U. S. 236, where the Director General was denied priority under § 3466. *United States* v. *Marxen*, 307 U. S. 200, 203, expressly did not decide the point.

[3] *Keifer & Keifer* v. *R. F. C.*, 306 U. S. 381, 389.

[4] *United States* v. *Marxen*, 307 U. S. 200, 206; *United States* v. *Knott*, 298 U. S. 544, 547–48; *Mellon* v. *Michigan Trust Co.*, 271 U. S. 236, 240.

[5] *Spokane County* v. *United States*, 279 U. S. 80, 92; *Price* v. *United States*, 269 U. S. 492, 500; *Bramwell* v. *U. S. Fidelity Co.*, 269 U. S. 483, 487.

[6] *United States* v. *Fisher*, 2 Cranch 358, 389.

Title I of the National Housing Act, however, is not a revenue measure—it was intended to stimulate recovery and employment in the construction industries and to enable property-owners to obtain funds for sorely needed repairs by insuring financial institutions against loss on loans for such work.[7] This was accomplished by what is, in effect, a guarantee that all losses on rehabilitation loans, up to a predetermined percentage (20% here) of the total made by the financial institution, would be borne by the United States, either by taking over loans in default or paying the deficit.[8] That loss Congress intended the Government to bear.[9] In estimating the loss, it relied upon the experience of private companies which were unaided by any such priority as § 3466.[10] Loans could

---

[7] Message of the President, May 14, 1934, 78 Cong. Rec. 8739–40 (Senate), *id.* at 8773–74 (House). Concerning the doldrums of the construction industry, see 78 Cong. Rec. 11194, 11198, 11210, 11211; Hearings on Sen. 3603, Committee on Banking and Currency, 73d Cong., 2d Sess., May 16–24, 1934, pp. 166 ff. Concerning the need for repairs, see 78 Cong. Rec. 11194, 11214; Hearings on Sen. 3603, *supra*, at pp. 36, 48, 288, 290.

[8] Regulation No. 18—Modernization Credit Plan—Title I, National Housing Act, provided: "The Federal Housing Administration will reimburse any insured institution on losses up to a total aggregate amount equal to 20% of the total face amount of all qualified notes taken or current face value of notes purchased by the financial institution, during the time the insurance contract is in force, and held by it or on which it continues liable. . . ." Modernization Credit Plan, Bulletin No. 1, p. 30 (revised reissue, Dec. 10, 1934).

[9] Senator Bulkley, chairman of the subcommittee (78 Cong. Rec. 11974) stated to the Senate: "It is contemplated that there will be a loss to the Government under this title, but that probably the loss will not be very great. . . . The reason we justify this provision is that it will make possible a considerable expenditure of money on needed repairs and renovation and thereby stimulate business in trades which very much need stimulation at this time." 78 Cong. Rec. 11981, 73d Cong., 2d Sess.

[10] 78 Cong. Rec. 11195–11196, 11981, 11982, 73d Cong., 2d Sess. See Hearings on Sen. 3603, *supra*, at pp. 293–94.

not be made for a longer term than five years, and many would be for less. Stable economic improvement was hardly to be expected within that time, and yet, many of those who borrowed would die, or default, and undergo some sort of financial liquidation. The enforcement of § 3466 under those circumstances would shift the loss from the Government to competing creditors, thus hampering the efforts of private business and capital to achieve that economic recovery which was the aim of the legislation.[11]

Nothing in the hearings, the debates or the Act show definitively that Congress considered the application of § 3466 to government claims under the National Housing Act. If the two acts alone were to be appraised, it might well be concluded that, as they are not necessarily inconsistent, both should be enforced. But the determination of Congressional purpose is not so simple as that. Upon the assumption that the applicability of § 3466 never came to the attention of Congress, we must find legislative purpose not from the language of the two Acts alone but from generalizations as to the object of the new statute and from judicial interpretations of the meaning of the old. To reach a sound conclusion as to the applicability of the priority statute and the purpose of Congress deduced merely from the state of the law at the time of the enactment of the Housing Act, we need to weigh the precedents under § 3466 quite as carefully as the Acts themselves, in order to develop the legal situation

---

[11] These loans were to be so-called "character" loans, in reliance on the character and stable earnings of the borrower. 78 Cong. Rec. 11194, 11195, 11981. It was expected that while many persons at the time had no stable income, the Act would temporarily promote new employment which once under way was hoped would continue long enough of its own force to culminate in permanent business recovery and repayment of the borrowed money. Hearings on Sen. 3603, *supra,* at pp. 46, 173.

into which the Housing Act was injected. When this is done, it is apparent that, each time this Court has considered legislative purpose as to § 3466 in relation to government claims under public financial legislation affecting creditors competing with the Government, it has determined § 3466 did not apply.[12]

The National Housing Act was "one of the latest of a series of enactments, extending over more than a century, through which the Federal Government has recognized and fulfilled its obligation to provide a national system of financial institutions. . . ."[13] Section 3466 is inconsistent with this purpose.[14] It is not significant that in the case of Cook County National Bank the debtor bank against which priority was denied was in the federal financial system, while here the debtor is a private corporation which has participated in a federal financing plan. The intrusion of a novel priority, uncertain in amount because unrecorded, into the intricate credit system of the Nation at a time of strain, would be a drag on recovery, rather than a stimulus. Suppliers of goods or services in all fields of credit activity would be moved to constrict their advances to a borrower known to have created a secret but valid lien upon his assets superior to all general creditors. The full reach of the implication of credit dislocation may be readily gauged by the fact that, at the end of 1936, 1,326,102 separate rehabilitation loans had been made under Title I for an aggregate amount of $500,220,642.[15]

---

[12] Cook County Nat. Bank v. United States, 107 U. S. 445; United States v. Guaranty Trust Co., 280 U. S. 478; cf. Sloan Shipyards v. U. S. Fleet Corp., 258 U. S. 549; Mellon v. Michigan Trust Co., 271 U. S. 236.

[13] Validity of Certain Provisions of the National Housing Act, 38 Ops. Atty. Gen. 258, 262.

[14] Cook County Nat. Bank v. United States, 107 U. S. 445.

[15] Third Annual Report of the Federal Housing Administration, House Doc. No. 48, 75th Cong., 1st Sess., p. 7.

Possible priorities will now exist for every outstanding dollar.

The facts of this case show how government aid to a debtor may be a snare for his other creditors if the priority statute operates in this class of claims. About a dozen claimants became creditors in the aggregate amount of some nine hundred dollars for labor. Such labor claims were entitled to the preference under Missouri law common to labor claims. But for the priority of the Government's claim, they would receive all of the realization from the assets—about two-thirds of their claims. But a month before the appointment of the receiver, the Federal Housing Administration took over from a bank a note of about $6000. From a deferred position in the hands of the bank, this debt is said to have stepped into a preferred position by transfer to the government agency. As such, it absorbs all of the assets, and the laborers who trusted their employer's credit get nothing. Such a preference of creditors, brought about by the debtor, would be an act of bankruptcy.

In 1920, when the railroads needed funds but lacked credit for private borrowing, government loans were authorized by Congress, based upon such prospective earning power and security as would furnish reasonable assurance of repayment.[16] In *United States* v. *Guaranty Trust Co.*, 280 U. S. 478, we held that the rehabilitating functions and the security provisions of the Transportation Act of 1920 were so inconsistent with § 3466 as to preclude its application in the receivership of a debtor railroad. Even more inconsistent considerations exist in this case. Congress was confronted with widespread need of repairs on property owned by persons without the cash or credit to secure them.[17] Moreover, not only homeowners

---

[16] Transportation Act of 1920, § 210, 41 Stat. 468.

[17] 78 Cong. Rec. 11199, 11388, 11981, 73d Cong., 2d Sess.; Hearings on Sen. 3603, *supra*, at pp. 30, 172, 174, 179.

but, like the railroads, hard pressed business establishments, such as the distillery in this case, were to be assisted in securing modernization loans.[18] Instead of lending these people federal funds, Congress lent them federal credit on which to borrow private funds, with the evident purpose of keeping the program as much as possible a matter of private enterprise handled in the course of private affairs. Assurance of repayment was rested not on a combination of security and earning power but deliberately upon earning power alone.[19] Whereas, with the railroads, interest corresponding to the risk was charged, no premium was charged for the insurance of loans under Title I,—with the expectation that the Government would pay the loss as its contribution to recovery.[20] The declared purpose of the United States to absorb the losses of the lenders is clearly inconsistent with the priority over other creditors given by § 3466. It seems beyond doubt, to me, that Congress did not expect a priority under Title I which the *Guaranty Trust* case certainly denied it under Title II relating to insured mortgages.[21]

Even in the mechanics of its operation, Title I repudiated the benefits of § 3466. Collection was left to the financial institution after default, so long as there was

[18] The loan limit of Title I was soon increased to meet business needs. Amendment of May 28, 1935, 49 Stat. 299.

[19] 78 Cong. Rec. 11194, 11195, 11981, 11982, 73d Cong., 2d Sess.; Hearings on Sen. 3603, *supra*, at pp. 37, 39, 293.

[20] Senator Bulkley stated: "The lender receives 20-percent insurance automatically as an inducement to make loans of this particular character. Frankly it is contemplated that the Government will lose some money." 78 Cong. Rec. 11982, 73d Cong., 2d Sess. See also 78 Cong. Rec. 11195; Hearings on Sen. 3603, *supra*, at pp. 34–35.

[21] Moreover, since July 1, 1939, there is a .75% insurance charge under Title I, so that in the future, whatever the decision here, even Title I would seem to be governed by the *Guaranty Trust* case. 24 C. F. R. § 501.18 (Supp. 1939.)

hope of partial liquidation.[22]   The lender, of course, had no priority.

The judgment should be affirmed on the ground that no priority exists by virtue of § 3466.

MR. JUSTICE ROBERTS, MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON concur in this dissent.

---

[22] Modernization Credit Plan, Bulletin No. 1, *supra*, at p. 8 states: "It is to the interest of the financial institution to carry the collection process on a defaulted note as far as there is reasonable prospect of ultimate payment inasmuch as complete reimbursement for any expenses incurred is provided as specified hereinafter.  This policy will tend to conserve the insurance reserve of 20% for possible later losses and also will maintain the understanding of the local community that these notes require the same prompt handling by makers as any other credit obligation. . . . it is the policy of the Federal Housing Administration to permit financial institutions every possible latitude in making collections on delinquent items.  It is only after it clearly appears that further collection efforts will be fruitless that the Federal Housing Administration will insist that claim be made.  Financial institutions are, therefore, given a full year after default on the note to effect collection. . . . If 10% of the amount due on the note is collected within the first year after default on the note and so long thereafter as 5% at least is collected in each six-month period, the Federal Housing Administration will not require that claim be made, but will permit the financial institution to proceed with its collection efforts.  Claims may include: (1) Net unpaid principal; (2) uncollected earned interest (after maturity interest is not to be claimed at a rate exceeding 6% per annum); (3) uncollected 'late charges'; (4) uncollected court costs, including fees paid for issuing, serving and filing summons; (5) attorney's fees not exceeding 15% of the amount collected on the defaulted note; (6) handling fee of $5 for each note, if judgment is secured, plus 5% of amount collected subsequent to return of unsatisfied property execution."