This is an appeal from an order of the Circuit Court of Roberts County, which affirmed an order of the County Court of that county and which orders denied a preference to the plaintiff, appellant, over *Page 209 
certain other creditors in the Estate of Wilhelm Buttke, Deceased, the administrator of his estate being the defendant, respondent, herein. The plaintiff's claim was filed in the amount of $523.80. The Final Report of the administrator showed the estate to be highly insolvent. The claims filed against the estate and to be paid aggregated $9,241.60 and the Final Report showed there was a balance on hand available to creditors in the amount of $1,394.64. The administrator sought to pro rate the amount on hand among all creditors, including the plaintiff, and the County Court so ordered and its order was affirmed by the Circuit Court.
The claim of the plaintiff is based upon seven notes all dated between July 28, 1934, and March 19, 1935, with maturity dates from August 31, 1935 to November 1, 1935, and all notes drawing interest at 5 1/2% payable annually. All of the notes are made payable to "Governor Of The Farm Credit Administration, or Order, Washington, D.C." All of theses notes are in the usual form of a promissory note, except in the following particulars:
Six of the notes have printed at the top the following: (This instrument given to the Governor, Farm Credit Administration, acting pursuant to the Act of Congress approved June 19, 1934.)"
At the bottom of these six notes there appears the following: "This note is given as evidence of a loan made by the Governor of the Farm Credit Administration."
On one of the notes the following is printed at the top: "(This instrument given to the Governor, Farm Credit Administration, acting pursuant to the Act of Congress approved February 23, 1934.)"
At the bottom of this note there is printed the following: "This note is given as evidence of a loan made by the Governor of the Farm Credit Administration, which loan is secured by a lien instrument covering personal property."
Accompanying the claim as filed there is an instrument designated "Memorandum" which asserts the claim is to be preferred under the laws of the United States and there is quoted in full Sections 3466, and 3467, R.S. 31 U.S.C.A. §§ 191, 192. *Page 210 
The claim as filed by the plaintiff was approved by the administrator for its full amount, including interest.
The Federal Priority Statutes relied upon by plaintiff were enacted in 1797 and have come down to the present time with no material changes and read as follows:
R.S. § 3466, 31 U.S.C.A. § 191, "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts makes a voluntary assignment thereof, or in which the estate and effects of an abscounding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."
R.S. § 3467, 31 U.S.C.A. § 192, "Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."
Our State Statute establishes order of priority and payment of claims at SDC 35.1422 as follows:
"35.1422 Order of payment of claims. All demands against the estate of any deceased person must be paid in the following order:
"(1) The expenses of administration;
"(2) Funeral expenses, including reasonable cost of burial lot, and not to exceed fifty dollars for marker on grave;
"(3) The expenses of last sickness;
"(4) Any debt that may be due by decedent personally to servants and employees for services rendered within the sixty days next preceding his death; *Page 211 
"(5) Debts having preference by the laws of the United States;
"(6) All other demands against the estate, except that where a lien for any demand exists by mortgage, pledge, attachment, judgments, or execution levy, such lien shall have preference according to its priority to the extent of such demand, on any specific property on which such lien shall have attached."
Plaintiff's claim is not filed in the name of the United States of America. It can be treated as a claim filed by the United States of America only by inference, explanation and argument. In plaintiff's brief the claim is characterized as being filed by "The United States of America, Department of Agriculture, Farm Credit Administration, through the Governor of the Farm Credit Administration * * * based upon loans administered by the Emergency Crop and Feed Loan Office. * * *"
Plaintiff asserts its claim should have priority because the loans were made under an Act of Congress intended for the relief of drouth and storm stricken farmers who could not obtain credit from privately owned loaning organizations, and that the act of making loans was a benevolence on the part of the Government. It is claimed the rate of interest provided for in the notes is below the ordinary commercial rate.
Defendant insists priority should not be granted and contends that the Government is not acting in its soverign capacity in going into the money loaning business and for profit in competition with private business. Defendant further contends that this court may take judicial notice that the lending of money under the setup under which the instant loans were made has ever since continued and that such loans are being made at this time in competition with private capital and long after any emergency ceased to exist; thus placing the Government in competition with private business when ample private capital is available and thus indicating that the Government is in the private loaning business and for profit. Defendant also claims that the *Page 212 
general rule is that Governments in creating corporations or agencies to carry on functions for it does not invest them with special privileges unless granted in the statute creating them.
[1] Defendant also contends the act under which the loans were made is an Act of Congress setting up the Farm Credit Administration with the privilege of transacting business as such, with the right to sue and be sued exactly as any other corporation or organization doing business for profit. The plaintiff contends there is nothing in the act which provides that the Farm Credit Administration may sue or be sued. However this may be, it may be observed in this case the plaintiff is using the courts of the state in litigation to protect its interests. The court may also take judicial notice that many claims of this character have actually been sued in the courts, exemplifying that the plaintiff at least would interpret the act as giving authority for the plaintiff to sue.
The Act of Congress authorizing the loans in this case was approved February 23, 1934, Vol. 48, Part 1, U.S. Stat. at Large 354, and brief reference to some of its provisions may be made.
It is designated as "An Act to provide for loans to farmers for crop producing and harvesting during the year 1934, and for other purposes."
Section 1 provides that the "Governor of the Farm Credit Administration" is authorized to make the loans to farmers.
Section 2 provides as security for the loans a "first lien" on all crops planted during the year 1934 or on livestock. The Section further provides the loans shall be made "through such agencies, upon such terms and conditions, and subject to such regulations as the Governor shall prescribe." The maximum rate of interest on the loans is not to exceed 5 1/2% per annum, no minimum rate being set. There is also set up a very efficient collection service, it being provided the Governor may use the facilities and services of the Farm Credit Administration or any of its *Page 213 
officers and that the Governor may pay for such facilities; and further provides that "such institutions" are expressly empowered to enter into agreements with the Governor for such purposes. A maximum loan of $250 is provided except that in the discretion of the Governor he may make the loan $400 and the further exception that the loan shall be unrestricted in those areas that have been certified by the President of the United States to the Governor as distressed emergency areas.
Two conditions must exist for the applicant to obtain a loan. First he must show that he is unable to procure a loan from other sources in an amount reasonably adequate for his needs; and second, the applicant must certify that he is directly co-operating in the crop production program of the Agricultural Adjustment Act or that he is "not proposing to increase his 1934 production of basic agricultural commodities in a manner detrimental to the success of such program."
Section 3 provides that the moneys loaned are declared to be impressed with a trust to accomplish the purposes provided for in the act "until the moneys loaned pursuant to this Act have been used for the purposes contemplated by this Act, * * *."
Section 4 invests the Governor with very wide authority and power to set up the loaning structure. Even without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States the Governor may fix the compensation and duties of the agents, officers and employees that may be necessary to carry on the purposes of the Act.
Section 5 provides for an appropriation of forty million dollars to carry out the provisions of the Act and the Act concludes with the following: "Any moneys so appropriated, and all collections of both principal and interest on loans made under this Act, may be used by the Governor for all necessary administrative expenses in carrying out the provisions of this Act and in collecting outstanding balances on crop production, seed and feed loans * * *." *Page 214 
The Act of Congress just considered appears to set up a complete loaning agency with wide powers in the Governor, as to its operation, and with an appropriation of money from the Government to sustain the organization. Subsequent legislation has continued in one form or another the loaning of money to farmers under the Farm Credit Administration, the system of loaning still existing.
[2] Plaintiff's counsel contends there should be priority of the claim, based upon a loan made under the foregoing Act. Considering the claim as it relates to our State Statute in the order of payment, the expenses of administration and burial expenses would have priority over the plaintiff's claim. The plaintiff's claim would have preference over classes 3 and 4 of our statute which are the expenses of last sickness and debts due by the decedent to servants and employees for services rendered within sixty days preceding his death. The question here to be determined is whether the plaintiff's claim should be designated within class 5 under our state law as a debt having preference by the laws of the United States or whether it should be in class 6 applying to general creditors.
In Sloan Shipyards Corporation et al. v. United States Shipping Board Emergency Fleet Corporation and the United States of America, 258 U.S. 549, 42 S.Ct. 386, 389, 66 L.Ed.. 762, there are three cases combined, all bringing into question the standing of the United States Shipping Board Emergency Fleet Corporation in the courts; one of the cases involving directly the right of priority over the other creditors in bankruptcy by the Fleet Corporation. The Shipping Act of Sept. 7, 1916, being Chap. 451, 39 Stat. at L. 728, 46 U.S.C.A. § 801 et seq., was passed in contemplation of the possibility of war and to create a naval reserve and merchant marine, and under it the United States Shipping Board was established, and given power to form a corporation under the laws of the District of Columbia, and it did organize the United States Shipping Board Emergency Fleet Corporation. The Act contemplated that the corporation named should be organized so that private *Page 215 
persons might be minority stockholders, the Shipping Board to be a majority stockholder. However, the United States purchased all of the stock, thereby furnishing all of the money for this governmental agency. This corporation filed its claim with the trustee in bankruptcy of the Eastern Shore Ship Building Corporation and claimed priority over other creditors, all of the money of the corporation having been furnished by the Government. This priority was denied by the referee in bankruptcy, the District Court and the Circuit Court of Appeals and affirmed in the opinion written by Justice Holmes from which we quote the following:
"The third case, as we have said, is a claim of priority in bankruptcy. It was asserted against the estate of the Eastern Shore Shipbuilding Corporation, in the District Court for the Southern District of New York, under a contract similar to that last described, made by that company with the Fleet Corporation `representing the United States of America' to construct six harbor tugs. The claim was presented by the Fleet Corporation in its own name, but was put forward by it as an instrumentality of the Government of the United States. It was denied successively by the referee, the District Court, and the Circuit Court of Appeals, on the grounds that the Fleet Corporation was a distinct entity, and that, whatever might be the law as to a direct claim of the United States, the Fleet Corporation stood like other creditors and was not to be preferred. In re Eastern Shore Shipbuilding Corporation, 2 Cir., 274 F. 893. The considerations that have been stated apply even more obviously to this case. The order is affirmed."
To the foregoing decision Chief Justice Taft filed a dissenting opinion as it related to the first and second cases under consideration, but in which he concurs with the decision in the third case which involved the question of priority. He limits the preference or priority of the United States in bankruptcy to claims of the United States for taxes and we quote the following from his dissenting opinion: "As to the preference claimed against a bankrupt in No. *Page 216 
526 by the Fleet Corporation, I concur in the conclusion of the Court that it cannot be allowed under the statue as to preferences in bankruptcy because I do not think it extends to claims of the United States except those for taxes."
In the case of United States of America v. Guaranty Trust Co. of New York et al., 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556, the Supreme Court was considering the right of priority of the United States over other creditors under Revised Statutes, § 3466, U.S.C.A., Title 31, § 191. During World War 1 when the railroads were under Federal control the railroad transportation system became in distress financially. Title 2 of the Transportation Act of 1920, 49 U.S.C.A. § 71 et seq., provided for the loaning of enormously large amounts to meet the pressing need of the railroads. These loans to the railroads were made to them directly by the United States and not through any of the corporate or other fiscal agencies of the United States handling business for it. The Minneapolis St. Louis Railroad had obtained one of these loans and in 1923 the Federal Court of Minnesota appointed a receiver of it and the usual order issued for proof of claims. It was conceded the railroad was insolvent. The United States presented four claims arising under Title 2 of the Transportation Act of 1920 and as to each claim it asserted that it was entitled to priority and preference over the claims of all other creditors under the priority statute. Upon adverse decisions by the master and the District Court and in the Circuit Court of Appeals the case was presented to the Supreme Court. In upholding the decisions below and denying the preference to the United States we quote the following from this decision:
These appropriations were made in order to meet a pressing need. At the time of the passage of Transportation Act 1920, most of the railroads of the United States lacked funds for necessary improvements, equipment, and expansion of facilities. Some of the carriers needed funds, also, to meet maturing obligations. The credit of many carriers was seriously impaired. There was a general reluctance among investors to purchase new railroad securities even *Page 217 
of the strongest railroads. Congress deemed it important to preserve for the nation substantially the whole existing transportation system. Compare New England Divisions Case (Akron, C. Y.R. Co. v. United States), 261 U.S. 184, 190, 43 S.Ct. 270, 67 L.Ed. 605, [609]. In order to accomplish this, it was thought necessary that the United States should, to a certain extent, finance the carriers until it would become possible to restore their credit, by increase of rates or otherwise. The provisions of title 2 of Transportation Act, 1920, were framed to that end. Through them, the financial aid which had been given during Federal control was to be extended for a futher period.
"To have given priority to debts due the United States pursuant to title 2 would have defeated the purpose of Congress. It not only would have prevented the reestablishment of railroad credit among bankers and investors, but it would even have seriously impaired the market value of outstanding railroad securities. It would have deprived the carriers of the credit commonly enjoyed from supply men and others; would have seriously embarrassed the carriers in their daily operations; and would have made necessary a great enlargement of their working captial. The provision for loans under section 210 would have been frustrated. For carriers could ill afford voluntarily to contract new debts thereunder which would displace, pro tanto, their existing bonded indebtedness. The entire spirit of the act makes clear the purpose that the rule leading to such consequences should not be applied."
The facts in the foregoing decision are practically an exact parallel with the case we have under consideration. In one case the Government loaned money direct to the needy railroads to assist and sustain the transportation system, and in our case the money was loaned to needy farmers with the thought of assisting and sustaining agriculture which was in distress. The reasons given why the United States should not claim priority in this case are equally pertinent in our case under consideration, as knowledge of priority of Government claims certainly would have *Page 218 
been a handicap to a farmer in using his credit with local bankers and investors. We consider this decision controlling in this case.
Without discussion of them the following supporting decisions are cited: Keifer Keifer, a Co-partnership, v. Reconstruction Finance Corporation and Regional Agricultural Credit Corporation of Sioux City, Iowa, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; United States v. Strang, 254 U.S. 491, 41 S.Ct. 165, 65 L.Ed. 368; Eichberg v. United States Shipping Board Emergency Fleet Corporation, 51 App.D.C. 44, 273 F. 886; Luxton v. North River Bridge Company, 153 U.S. 525, 14 S.Ct. 891, 38 L.Ed. 808; McCulloch v. State of Maryland et al., 4 Wheat. 316, 4 L.Ed. 579; State of Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307; Davis v. Pullen, 1 Cir., 277 F. 650; Guarantee Title 
Trust Co. v. Title Guaranty Surety Co., 224 U.S. 152, 32 S.Ct. 457, 56 L.Ed. 706; Lewis v. United States, 92 U.S. 618, 23 L.Ed. 513; United States v. State Bank, 6 Pet. 29, 8 L.Ed. 308; United States v. Mason, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133; La Roque v. United States, 239 U.S. 62, 36 S.Ct. 22, 60 L.Ed. 147; Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L.Ed. 244; Cook County National Bank v. United States,107 U.S. 445, 2 S.Ct. 561, 27 L.Ed. 537; State of Georgia v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796.
Appellant's counsel in supplemental brief cites as an authority the decision of United States of America v. Emory, 314 U.S. 423, 62 S.Ct. 317, 323, 86 L.Ed. 315, decided Dec. 15, 1941. This decision is illuminating as disclosing the conflict of opinion that has arisen in the Federal Courts, particularly in recent years, in reference to Government priorities. It is significant to observe that this decision, written by Justice Byrnes, reverses the Springfield Court of Appeals and the decision is a five to four decision by the Supreme Court. There is a very vigorous dissenting opinion, written by Justice Reed, and Justices Roberts, Douglas and Jackson concur in the dissent. The dissenting opinion points out that: "From past interpretation we learn that the *Page 219 
traditional function of § 3466 is the assurance of the public revenue, whatever may be the expense to the competing creditors," and that the majority opinion disturbs well settled law and precedents. The majority opinion does not pretend to overrule or reverse previous opinions of the court but seeks to explain them. The facts of this case are unusual. On September 23, 1935, the St. James Distillery, a corporation, executed a note to the Industrial Bank and Trust Company of St. Louis. On July 14, 1936, the bank endorsed the note and delivered it to the Federal Housing Administration, acting on behalf of the United States, under a contract of insurance and guaranty provided for in Title I of the National Housing Act, 12 U.S.C.A. § 1701 et seq. The United States, through the Federal Housing Administration, reimbursed the bank in the amount of $5,988.88, the balance due on the note. Emory had a claim for wages and asserted priority on his wage claim. These loans made by private investors, under the Federal Housing Act, were term loans not exceeding five years, and were guaranteed to the extent of 20% by the United States. No reason is shown in this opinion why this bank held this loan only about nine months.
In the decision of Federal Housing Administrator v. Moore, Trustee in Bankruptcy, 9 Cir., 90 F.2d 32, 34, decided May 10, 1937, a claim in bankruptcy had been filed by the Federal Housing Administrator. It was based upon money that the Government had furnished to reimburse a bank that made a loan that was not fully paid. Priority over other creditors was claimed in bankruptcy. The District Court denied this preference and on appeal to the Circuit Court of Appeals from the Ninth Circuit, by the Federal Housing Administrator, Judge Matthews sustained the District Court and denied priority and in doing so used the following language: "This contention cannot prevail. Appellant is not the United States. The United States is not a party to this proceeding. The bankrupt was never indebted to the United States. Its indebtedness was to the bank. The United States has no claim against the bankrupt estate, *Page 220 
and has asserted none. If the United States had any such claim, it could, and undoubtedly would, assert it in its own name. There is no reason why, in a bankruptcy court or elsewhere, the United States should call itself `Federal Housing Administrator.'"
But, conceding that the decision written by Justice Byrnes should be considered as authority that priority should be had on a claim filed under the National Housing Act, it should be noted there is not the slightest suggestion in the decision that it would be applicable to the case we have under consideration. Justice Byrnes particularly refers to and analyzes the decision of United States v. Guaranty Trust Co., supra, and recognizes and adopts its merits in assisting a financially distressed railroad transporation system. The same rule of law should apply when Government assistance is given to distressed agriculture.
We conclude it is much more logical to place the notes under consideration here within the decision of United States v. Guaranty Trust Co., supra, the facts being analogous, and deny priority, than to follow the decision of United States v. Emory, supra, where no analogy of fact appears.
Finding no error the order of the circuit court is affirmed.
WARREN, Circuit Judge, sitting for POLLY, J.
All the Judges concur.