James A. **GORDON, Special Deputy State Insurance Commissioner of Maryland and Receiver, Eastern Indemnity Company of Maryland in Receivership**

v.

**UNITED STATES DEPARTMENT OF the TREASURY, W.E. Douglas, Commissioner, United States Department of the Treasury, Fiscal Service.**

Civ. No. B–86–3354.

United States District Court,
D. Maryland.

Aug. 31, 1987.

Paul W. Grimm, David D. Gilliss, Baltimore, Md., for plaintiff.

Robert N. McDonald, Asst. U.S. Atty., Baltimore, Md., J. Christopher Kohn, Sandra P. Spooner, Washington, D.C., for defendants.

WALTER E. BLACK, JR., District Judge.

This case presents for resolution the always problematic situation that arises when a company lapses into insolvency and there is simply not enough money to satisfy each of the outstretched hands. The complexity of this insolvency is compounded by the existence of private as well as government creditors and a conflict in state and federal priority statutes. Whether the general rule of governmental priority shall apply to the facts of this particular case hinges exclusively upon the issue of whether the process of liquidating an insolvent insurance company and paying claimants constitutes the "business of insurance."

The facts underlying this case are basically undisputed. The Eastern Indemnity Insurance Company (hereinafter "EICOM") was licensed by the State of Maryland to do business in 1980. Its insurance business rapidly expanded to include more than thirty states throughout the United States.

Primarily, its business involved the underwriting of surety bonds for contractors.

In 1984, the State Insurance Commissioner launched an investigation into the financial affairs of EICOM, and EICOM was thereafter placed into voluntary rehabilitation as provided by the Maryland Insurance Code. Md.Ann.Code art. 48A, § 132 (1957). In 1985, the Circuit Court for Montgomery County, Maryland, ordered the liquidation of EICOM, and the company was then declared to be insolvent. The plaintiff, James Gordon, acting in his capacity as Special Deputy State Insurance Commissioner of Maryland, was appointed Receiver for EICOM. Gordon was to handle the day-to-day activities involved in the liquidation of this failed insurance business.

Among the duties of Gordon as Receiver was the settlement and supervision of the claims of the policyholders of EICOM. In accordance with the Maryland Insurance Code, a date was established by which time the claimants of EICOM were to file their claims or be forever barred. After the passage of the deadline, Gordon determined that the claims filed exceeded 75 million dollars. Though the amount of their assets is not easily calculable, it is, in any event, far less than the amount necessary to satisfy the claimants in full. Of the more than 75 million dollars in claims filed against EICOM, approximately 61 million dollars are made up of claims submitted by principals, obligees, material suppliers and subcontractors in connection with surety bonds issued by EICOM. Many of the projects for which EICOM issued performance and payment bonds were Miller Act construction projects. Thus, the United States Government is a claimant in addition to a number of private contractors.

By letter to Gordon from the defendant, W.E. Douglas, on behalf of the defendant, the U.S. Department of Treasury, the government asserted priority status to the assets of EICOM, which are subject to the control and administration of the plaintiff Gordon, in his official capacity as receiver for EICOM. The defendants also advised Gordon that, under the federal priority statute, he could be held personally liable for distributing assets in contravention of the statute. This litigation followed. On October 31, 1986, the plaintiff filed a complaint in federal court alleging that the action by the defendants in asserting a priority is illegal because it invalidates, impairs or supersedes provisions of the Maryland Insurance Code enacted for the purpose of regulating the business of insurance in contravention of the McCarran-Ferguson Act.[1] The plaintiff has sought a declaratory judgment that the defendants' assertion of a priority is illegal because it violates the McCarran-Ferguson Act and, further, that the defendants not take action to enforce the personal liability provision of the federal priority statute against Gordon.

This case involves the interplay of three statutes—two federal statutes and the Maryland Insurance Code. Broad policy statements underlie each of their statutory schemes. The first, section 3713 of Title 31 of the United States Code, establishes an absolute priority of government claims when an individual is insolvent and makes a voluntary assignment of property, has its property attached, or commits an act of bankruptcy.[2] It was Congress' purpose in enacting § 3713 to "protect the interest of the government in collecting money due to it where property of an insolvent debtor is involved." *W.T. Jones and Company v. Foodco Realty, Inc.*, 318 F.2d 881, 885 (4th

---

1. The complaint also alleged that the claims of materialmen, suppliers and subcontractors pursuant to Miller Act construction projects "do not constitute debts owed to the United States"; however, the parties have resolved this issue without court intravention and, therefore, it need not be addressed here.

2. Section 3713 provides in pertinent part that,
   (a)(1) A claim of the United States Government shall be paid first when—

   (A) a person indebted to the Government is insolvent and—
   (i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
   (ii) property of the debtor, if absent, is attached; or
   (iii) an act of bankruptcy is committed....
   31 U.S.C. 3713 (1983).

Cir.1963). Its provisions have been in effect since 1797, without any significant modifications. *U.S. v. Emory*, 314 U.S. 423, 428, 62 S.Ct. 317, 320, 86 L.Ed. 315 (1941). Section 3713 is the government's authority for asserting a priority over the assets of EICOM. Moreover, subsection (b) expressly provides that Gordon, as representative of EICOM, is personally liable to the government for paying debts ahead of the governmental priority.[3]

The Maryland Insurance Code establishes a comprehensive scheme for administering the liquidation of insolvent insurance companies. An important part of this Code is devoted to defining the types of claims which may be filed against an insurance company undergoing liquidation, and creating priorities for payment of these claims. For example, wages to officers and employees are paid first, administrative expenses are paid next and tax claims occupy the third priority. *See,* respectively, Md.Ann. Code art. 48A §§ 158 and 158A (1986). The category of priority claims relevant to this litigation is the fourth priority, namely, "[c]laims by policyholders, beneficiaries, and insureds...." This category represents by far the largest amount of claims. The plaintiff contends that the claims of the government are on the same priority level as all "policyholders, beneficiaries, and insureds" and, therefore, fall within the fourth priority. The government disagrees and cites 31 U.S.C. § 3713. Indeed, if it were not for the special nature of this case, implicating the insurance industry, the outcome of this dispute would be clear: the claims of the government would take priority by virtue of § 3713.

The McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, was enacted in 1945 due to congressional concern over federal regulation of insurance, traditionally a function of the states:

Congress declares that the continued regulation and taxation by the several

States of the business of insurance is in the public interest....

15 U.S.C. § 1011 (1976); *see* S.Rep. No. 20, 79th Cong., 1st Sess., 2 (1945); H.R.Rep. No. 143, 79th Cong., 1st Sess., 2–3 (1945), U.S.Code Cong.Serv. 1945, p. 670 and the discussion of the Supreme Court's decision in *United States v. South-Eastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Congress' second concern was the relationship between insurance ratemaking and the antitrust laws "[b]ecause of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intraindustry cooperation." *Group Life & Health Insurance v. Royal Drug Co.,* 440 U.S. 205, 221, 99 S.Ct. 1067, 1078, 59 L.Ed.2d 261 (1979). Consequently, a partial exemption from the antitrust laws was included in the McCarran-Ferguson Act. 15 U.S.C. 1012(b) (1976). The critical passage in the McCarran-Ferguson Act is that,

[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....

*Id.* Thus, the phrase "business of insurance" was born, and, so long as a state acts to regulate the "business of insurance," its legislation is free of the intervention of Congress, at least in the absence of a specific law enacted by Congress as to a given matter. *See* 19 *Appleman, Insurance Law and Practice* § 10323 (1982). Federal laws will not be construed to supersede state laws regulating the "business of insurance."

The sole question before this Court is whether the State of Maryland was acting to regulate the "business of insurance" when it established the statutory scheme regarding the liquidation of insolvent insurance companies and the priorities of claimants or policyholders for payment.[4] This

---

**3.** "A representative of a person or an estate (except a trustee acting under Title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to

the extent of the payment for unpaid claims of the Government." 31 U.S.C. § 3713(b) (1983).

**4.** The question of whether other portions of the Maryland Insurance Code regulate the "business

narrow issue was fully briefed by the parties and the Court heard oral argument of counsel. Amicus curiae briefs were filed on behalf of the National Association of Insurance Commissioners and on behalf of the Illinois Insurance Guaranty Fund, the Property and Casualty Insurance Guaranty Corporation, and the Wisconsin Insurance Security Fund. The matter is formally before this Court on Cross-Motions for Summary Judgment. The Court notes at the outset that summary judgment is clearly appropriate where the Court is faced with a motion and countermotion for summary judgment, wherein all parties admit to undisputed facts and are merely seeking a declaration of the law.

In broad terms, the legal question presented to the Court is whether the strictures of the McCarran-Ferguson Act afford protection to the state of Maryland's priority scheme for claimants of insolvent insurance companies. In order for the McCarran-Ferguson Act to apply, three elements must be met: (1) there must be a state statute intended to regulate or tax, (2) the "business of insurance" (3) which is invalidated, impaired, or superseded by an Act of Congress not expressly related to the business of insurance. Clearly, the Maryland Insurance Code was intended to regulate the insurance industry. Reorganization of insolvent insurance companies is a matter of state law and is handled through insolvency proceedings in state court. *Universal Marine Insurance Company, Ltd. v. Beacon Insurance Company*, 768 F.2d 84, 88 (4th Cir.1985). Equally clear is that the federal priority statute "invalidates, impairs or supersedes" the priority scheme set forth in the state statute. Thus, the focus in this case is solely on the "business of insurance" issue.

Through several recent opinions, the Supreme Court has enunciated the considerations to use in deliberating on whether

action by the state constitutes regulation of the "business of insurance" such that a federal law cannot operate to "invalidate, impair or supersede" its provisions. These Supreme Court cases effectively define and limit the antitrust exemption set out in the McCarran-Ferguson Act and are the controlling standards in determining what constitutes the "business of insurance." *See also, State of Maryland v. Blue Cross and Blue Shield*, 620 F.Supp. 907, 913 (D.Md. 1985).

Helpful to the Court's understanding of what constitutes the "business of insurance" is Justice Stewart's simple instruction in *Royal Drug*, 440 U.S. at 211, 99 S.Ct. at 1073, that the "business of insurance" is not synonymous with the "business of insurance companies."[5] In *Royal Drug*, a group of nonparticipating pharmacists brought an antitrust action against an insurance company claiming that they had entered into agreements with participating pharmacists to fix the retail price of drugs. Guided by congressional intent to establish only a limited exemption to the antitrust laws, the Court examined the allegedly illegal pharmacy agreements in light of the general concept of "insurance." The Court recognized two important features. First, that the primary element of insurance is the "spreading and underwriting of a policyholder's risk." *Royal Drug*, 440 U.S. at 211, 99 S.Ct. at 1073. Thus, the concept of insurance involves some risk-taking on the part of the insurance company. The Court found that the pharmacy agreements with the insurance company in order to minimize its costs were unconnected to the basic contractual obligation the insurance company had made with its insureds to cover the cost of their prescription drugs.

The second common aspect of insurance is the existence of a contract between the insurer and the insured. *Id.* at 215, 99

of insurance" is not before the Court and is not relevant to the Court's opinion and rulings in this case.

**5.** *See also,* Justice Marshall's observation in *Securities and Exchange Comm. v. National Securities, Inc.,* 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) regarding the history of

the McCarran-Ferguson Act: "The statute did not purport to make the States supreme in regulating all the activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.'"

S.Ct. at 1075. Citing the Court's earlier language in *Securities and Exchange Comm. v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969), Justice Stewart wrote,

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to [sic] must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

*Royal Drug*, 440 U.S. at 215–16, 99 S.Ct. at 1075. The Court concluded that the pharmacy agreements were in no way related to the contractual relationship between the insureds and the insurance company. The fact that the pharmacy agreements were entered into in order to lower the cost of premiums or affect their status as a reliable insurer was reflective of many of the business decisions made by an insurance company. To interpret otherwise, the Court wrote, would be to extend the definition of "business of insurance" to almost every business decision of an insurance company. *Id.* at 217, 99 S.Ct. at 1076. The conclusion of the Supreme Court in *Royal Drug* was that the insurance company was not exempt from the antitrust laws because the pharmacy provider agreements were not regulation of the "business of insurance." After *Royal Drug*, it was clear that, though many aspects of insurance companies are regulated by state law, they do not necessarily constitute the "business of insurance." Provider agreements by insurance companies for the the purchase of goods and services from third parties at a set price were not the "business of insurance." [6]

The Supreme Court addressed the concept of "business of insurance," and narrowed its scope further in *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). The *Pireno* case involved an alleged conspiracy to eliminate price competition among chiropractors by means of a committee that advised an insurance company regarding the chiropractor's fees and treatments. The Supreme Court held that the insurance company's use of the committee to render opinions regarding the necessity of chiropractor treatment and the reasonableness of fees did not constitute the "business of insurance" to exempt such a relationship from the scope of the antitrust laws.

The Supreme Court finally enunciated in *Pireno* three criteria relevant in determining whether a particular practice is part of the "business of insurance": first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. *Id.* at 129, 102 S.Ct. at 3009.[7] The *Pireno* court stated further that none of the criteria were "determinative" in and of themselves, but that the practice must be examined in light of all three. *Id.* Though the challenged practice

---

6. In *Royal Drug*, the Supreme Court discussed also the concept of "advance-payment medical-benefits plans" as distinguished from insurance. At the time of the enactment of the McCarran-Ferguson Act, corporations organized for the purpose of providing their members with medical services and hospitalization were not considered to be engaged in the insurance business at all, and thus were not subject to state insurance laws. *Id.* at 225–26, 99 S.Ct. at 1080. The Court went on to find that, even if these plans were considered to be insurance by various state legislatures, the incorporation of provider agreements to lower cost of prescription drugs would still not be considered the "business of insurance." The provider agreements were analogized to many statutes regulating diverse aspects of these advance payment plans (or of insurance plans) including, "the composition of their boards of directors, when their books and records could be inspected, how they could invest their funds, *when they could liquidate* or merge...." *Id.* at 230 n. 38, 99 S.Ct. at 1082 n. 38 (Emphasis added).

7. The Supreme Court recently reaffirmed these three criteria in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985).

in *Pireno* in essence focused on the claims adjustment process, the Court declined to find that it constituted the "business of insurance."

The Court first stated that the practice was "logically and temporally unconnected to the transfer of risk" accomplished by the insurance policies. *Id.* at 130, 102 S.Ct. at 3009. Risk is transferred at the time the contract of insurance is entered into between the insurer and insured and not later when, as in *Pireno,* the insurance company made the decision to pay a claim because it was thereafter determined to be "necessary" or "reasonable." Second, the Court determined that the insurer's use of the committee was not an integral part of the policy relationship between the insurer and insured because the insured has no interest in why his claim is paid but only in whether it is paid. *Id.* at 132, 102 S.Ct. at 3010. Finally, the Court observed that it was clear that the challenged practice was not confined to the insurance industry itself, but rather involved third parties "wholly outside" it. *Id.* Once again, the Supreme Court held that the challenged practice was not the "business of insurance" and the antitrust exemption of the McCarran-Ferguson Act did not apply.

Other cases decided by the Supreme Court and the lower courts are generally instructive in exemplifying what the "business of insurance" is and what it is not. For example, in *Royal Drug,* the Supreme Court noted that just because an agreement is necessary to provide insurance (such as provider agreements to minimize costs of service benefit insurance plans), it does not follow that it is also the "business of insurance." That an indemnity insurer must have a line of credit or other commercial arrangement with a bank in order to pay off monetary claims and to fulfill its obligations does not convert such an arrangement into the "business of insurance." *Royal Drug,* 440 U.S. at 214 n. 9, 99 S.Ct. at 1074 n. 9. Premium financing by an insurance company rather than a

third party loan or finance company does not constitute the "business of insurance." *Perry v. Fidelity Union Life Insurance Co.,* 606 F.2d 468 (5th Cir.1979) ("one can hardly claim that the extension of credit is an integral part of the insurance business." *Id.* at 470), *but see Lowe v. Aarco-American, Inc.,* 536 F.2d 1160 (7th Cir.1976). Diversification of an insurance company into areas of commerce in order to lower the cost of goods or services to its policyholders would not make such acquisitions the "business of insurance." *Royal Drug,* 440 U.S. at 215, 99 S.Ct. at 1075.

State laws deemed by the courts to regulate the business of insurance include, for example, those affecting the substantive content of insurance contracts, *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985) (mandated minimum health benefits laws); the fixing of rates, *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); the selling and advertising of policies, *FTC v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); and the licensing of companies and their agents, *Robertson v. People of State of California,* 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946).

The pronouncements of the Supreme Court in *Pireno* and *Royal Drug* are absolutely controlling in this area of the law.[8] This Court has unequivocally adopted the so-called *"Pireno* test" used by the Supreme Court to define narrowly the "business of insurance." *Blue Cross and Blue Shield,* 620 F.Supp. 907. Having established a legal framework for the narrow issue presented here, the Court must now characterize the challenged statute in this case within these strictures.

█ Absolutely crucial to the finding that a statute regulates the "business of insurance" is the concept of risk transfer or spread, as necessitated by the quintessential definition of the term "insurance."

**8.** Thus, the authorities cited by plaintiff are not in the least persuasive as none analyze the concept of "business of insurance" in light of these Supreme Court cases. *Levy v. Lewis,* 635 F.2d 960 (2d Cir.1980); *State of Idaho v. Internal Revenue Service,* 662 F.Supp. 60 (D.Idaho 1987); *Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y.1986).

Insurance is a "contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils." *Black's Law Dictionary* 721 (5th ed. 1979). The consideration is payment proportionate to the risk involved. A finding that a challenged state statute involves the transfer or spread of risk will satisfy the first prong of the *Pireno* test.

■ This Court has held that more than a relationship to risk spreading must be shown to meet the *Pireno* criterion. *Blue Cross and Blue Shield,* 620 F.Supp. at 917. The party seeking the protection of the McCarran-Ferguson Act must show that the challenged priority scheme is "related positively to underwriting and ratemaking." *Id.* That is, the practice of prioritizing claims such that all policyholders, including the United States, are treated similarly must "directly facilitate risk spreading and transfer through the provision of insurance." *Id.*

Plaintiff urges that the statutes specifically providing for liquidation of the insurance company and establishing the various priorities for claimants does reflect the concept of risk in the insurance industry. The risk that an insurance company will become insolvent, however, is not the kind of risk transfer emphasized in *Pireno* and *Royal Drug.* The fact that an insurance company may consider the possibility of insolvency as part of their overhead does not affect the essential obligation of the insurer to the insured as contained in the contract of insurance. The obligation of EICOM under its insurance policies to insure against risks of loss is wholly different from the procedure an insurance company must follow to pay claimants in case of insolvency. The policyholders are concerned with EICOM's recognition of its obligation to cover for their losses rather than the legal mechanisms involved in an insolvency proceeding and priority statute. *See, for example, Langdeau v. United States,* 363 S.W.2d 327, 331 (Tex.Civ.App.1962) ("This is not a regulation of the insurance business; it is a

priority established for a class of creditors of an insurance company").[9]

Similarly, plaintiff contends that other insurance companies must bear the risk of loss of an insurance company in the form of higher premiums to the Maryland guaranty association (the "Property and Casualty Insurance Guaranty Corporation"), an entity created for the purpose of ensuring payment of claims and avoiding loss caused by the collapse of an insurance company. Md.Ann.Code art. 48A § 504 (1986). The guaranty association pays all valid "covered claims" and is then entitled to file a claim with the receivership for reimbursement. If there are insufficient assets to pay the guaranty association, it bears the risk of loss, rather than the insureds. *Id.* § 508. The funds of the guaranty association consist of premiums assessed against viable insurance companies operating in the state of Maryland. *Id.* § 508. The *Pireno* concept of risk transfer and spreading focuses on the policyholders and not the insurance premiums paid by third party insurance companies. Underwriting and ratemaking is far removed from the policy considerations underlying a state's enactment of a guaranty association. A previous legislative determination that losses would be covered by the guaranty association is "logically and temporally unconnected to the transfer of risk...." *Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009.

Finally, the Court rejects plaintiff's argument that there can be no transfer of risk until the policy is paid and because the priority statute affects payment of the policy when the company is insolvent, enforcement of the statute transfers the risk. The *Pireno* court, upon examination of an insurance company's claims adjustment process, unequivocally stated that risk is transferred at the time the contract of insurance is entered into.

■ The "indispensable" first prong of the *Pireno* test has not been met in this case and, therefore, the Court must hold that the process of liquidating an insurance company and fixing the priorities of its claimants is not the "business of insur-

9. The *Langdeau* case too was decided pre-*Royal Drug* and *Pireno.*

ance" as that term is defined in the McCarran-Ferguson Act. Summary judgment can be granted in favor of the United States on this ground alone. Plaintiff's assertion that it need only meet one of the three *Pireno* requirements is tenuous in light of the Court's recognition that satisfaction of the first prong of the *Pireno* test, whether the challenged statute facilitates the transfer or spread of risk, is overwhelmingly important. Though the Supreme Court did not make it perfectly clear as to whether all three requirements must be satisfied,[10] the Court finds that failure to show a positive relationship to underwriting and ratemaking is fatal.

In any event, the last two prongs of the *Pireno* test have not been met. The Court finds that neither the liquidation statute nor the priority statute are an "integral part" of the relationship between the insured and the insurer. The contractual liability to pay on a policy of insurance is obviously distinct from the question of who gets paid first. As with the claims adjustment process described in *Pireno*, the concern is whether a claim is paid, not why it is paid. *Pireno*, 458 U.S. at 132, 102 S.Ct. at 3010. Plaintiff contends that the priority statute does in fact determine whether a policyholder gets paid. The fallacy of plaintiff's argument is in his focus on the sufficiency of assets of the insurance company and its financial ability to pay rather than its liability for risks of loss as embodied in the contract of insurance. Whether the individual policyholder would be entitled to payment was determined when the contract was entered into; that is, when the risk was transferred, and not at the time of payment, if any. In this regard, the Court sees no difference between the claims adjustment process in *Pireno* and the priority of claims for payment in the Maryland Insurance Code.

Moreover, in the process of liquidating an insurance company and providing for payment of its claimants, the entity is no longer operating as an insurance business at all. The policyholders stand on equal footing with all other claimants in their interest in getting paid. Likewise, the provision of the insurance code providing that employees' wages should be paid first does not constitute the "business of insurance."

Similarly, as to the final prong, it is clear that the liquidation of EICOM and the payment of claims involve entities outside the insurance industry.[11] It is not required that all parties involved in a challenged practice be insurance companies. *Blue Cross and Blue Shield*, 620 F.Supp. at 919. Insolvency and priority statutes, however, are not peculiar to the insurance industry. The appropriate focus of the "business of insurance" analysis is the nature of the activity itself, not the type of business that is conducting it. *Perry v. Fidelity Union Life Insurance Co.*, 606 F.2d at 470. These statutes govern the rights of all creditors, not just policyholders.

Accordingly, the liquidation of an insolvent insurance company and the priority of claims paid thereto does not constitute the "business of insurance" as that term is used in the McCarran-Ferguson Act.

Proffered policy arguments by the plaintiff do not persuade this Court to carve out an exception to the seemingly harsh results in this case.[12] The plaintiff questions the

---

10. Of the three criteria relevant in determining whether a particular practice is part of the "business of insurance," the Supreme Court wrote, "[n]one of these criteria is necessarily determinative in itself...." *Pireno*, 458 U.S. at 130, 102 S.Ct. at 3009. It is also clear that satisfaction of only one of the criteria is not determinative. *Pilot Life Insurance Co. v. Dedeaux*, —— U.S. ——, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987).

11. This Court has noted that this last criterion of the *Pireno* test "should be given less weight than the previous two." *Blue Cross and Blue Shield*, 620 F.Supp. at 918.

12. Whatever the result of this case, "covered claims" of policyholders will be paid by the Property and Casualty Insurance Guaranty Corporation. It is the guaranty association, as well as policyholders of "uncovered claims," who will bear the loss. "Covered claims" are, generally, those insurance policy contracts issued to residents of the state of Maryland or for the protection of third parties who reside in the state of Maryland. Md.Ann.Code art. 48A, § 505 (1986). The claims of the United States would not be a "covered claim."

applicability of § 3713 itself and suggests that the original purpose underlying its enactment no longer exists. This Court is not prepared to question the validity of an almost two-hundred year old statute established for precisely the purpose of seeing that the government gets paid. *King v. United States,* 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964). Moreover, the Supreme Court has instructed that the priority statute is to be construed liberally in order to effectuate this purpose.[13] *United States v. Emory,* 314 U.S. 423, 426, 62 S.Ct. 317, 319, 86 L.Ed. 315 (1941), *citing Bramwell v. U.S. Fidelity and Guaranty Co.,* 269 U.S. 483, 487, 46 S.Ct. 176, 177, 70 L.Ed. 368 (1926). The United States may rightfully assert its priority under § 3713. Summary judgment will be entered in favor of the defendants. Counsel for defendants shall submit an appropriate Order to the Court in conformity with this opinion within ten days.

13. The McCarran-Ferguson Act is to be narrowly construed in face of valid federal regulatory interests. *Cochran v. Paco, Inc.,* 606 F.2d 460, 467 (5th Cir.1979).