**STATE OF IDAHO ex rel. Wayne SOWARD, Director of the Department of Insurance; State of Idaho, as liquidator for Pacific Insurance Administrators, Inc., and Pacific Insurance Administrators Agency, Inc., Plaintiffs-Appellees,**

v.

**UNITED STATES of America and the Internal Revenue Service, Defendants-Appellants.**

No. 87–4057.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 1, 1988.

Decided Sept. 7, 1988.

**446**

Steven W. Parks, Atty. Tax Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Richard H. Greener, Clemons Coshow & Humphrey, Boise, Idaho, for plaintiffs-appellees.

Carole J. Olson, Kansas City, Mo., for amicus Nat. Ass'n of Ins. Com'rs.

Before FLETCHER and CANBY,* Circuit Judges, and AGUILAR, District Judge.**

AGUILAR, District Judge:

In this appeal the Internal Revenue Service challenges the district court's determi-

nation that an Idaho statute which establishes priority among creditors of insolvent insurance companies is a law "regulating the business of insurance" within the meaning of the McCarran-Ferguson Act and therefore supersedes the priority standard erected by the Federal Insolvency Statute, 31 U.S.C. § 3713, 662 F.Supp. 60. We reverse the decision of the district court, vacate the judgment, and remand the case for entry of judgment in favor of the United States of America.

FACTUAL BACKGROUND.

Pacific Insurance Administrators Agency, Inc., and Pacific Insurance Administrators, Inc., formerly engaged in the insurance business in Idaho. After encountering financial problems, the companies stipulated with the Director of the Idaho Department of Insurance ("Director") to cease doing business on February 23, 1983. The stipulation was filed in Ada County District Court on March 7, 1983. On February 25, 1983, the companies further stipulated with the Director to surrender to him possession of the assets of the companies and to accept liquidation of the companies with the Director acting as liquidator.

During the liquidation process, the Internal Revenue Service ("IRS"), on behalf of the United States, submitted claims for federal taxes, including penalties and interest, owed by the two companies. Amended claims stated that Pacific Insurance Administrators Agency, Inc., owed the United States $25,514.20, and that Pacific Insurance Administrators, Inc. owed the United States $88,482.26.[1]

The State of Idaho has laws that regulate insurance companies in the state from their inception to their liquidation. These laws are codified in the Idaho Insurers' Supervision, Rehabilitation and Liquidation Act, §§ 41–3301—41–3360 of the Idaho Code (hereafter referred to as the "Idaho

---

* During the time this case was under submission, Judge Anderson died. Judge Canby was drawn to replace him and has reviewed the file and the briefs submitted in this case and has listened to the tape recording of oral argument.

** The Honorable Robert P. Aguilar, United States District Court Northern District of California, sitting by designation.

1. Each corporation had failed to pay proper amounts due with respect to withholding and FICA taxes, corporate income taxes, and federal unemployment taxes. The precise tabulations for the taxes due to the United States from each corporation are as follows:

Insurance Code"). Section 41–3342 of the Idaho Insurance Code establishes the priority of distribution among claims against the estate of a liquidated insurer,[2] setting forth eight classes of claimants in descending order of priority. Class 5 of the priority scheme includes claims of "the federal or any state or local government."

As liquidator of the two companies, the Director determined that the claims of the United States ought to be handled under § 41–3342 of the Idaho Insurance Code. Pursuant to the statute, the Director relegated the claims to Class 5. The liquidation proceeds were insufficient to pay both Class 4 claims, which consisted principally of the claims of approximately one hundred fifty general creditors, and Class 5 claims. Because the statute provides that all Class 4 claims are to be paid prior to the payment of any Class 5 claims, the United States would not receive full satisfaction of the insolvents' obligations.

The United States disputed the priority assigned to its claims, asserting that it was entitled to payment ahead of Class 4 claims under the Federal Insolvency Statute ("FIS,") 31 U.S.C. § 3713.[3] The FIS provides, *inter alia*, that claims of the United States shall be paid first whenever an insolvent person indebted to the federal government has made a voluntary assignment of property or has committed an "act of bankruptcy."

After obtaining an order from the Ada County District Court permitting him to set aside $90,927.17 to pay the claims of the United States, the Director as liquidator brought this interpleader action in the United States District Court for the District of Idaho ("District Court") seeking a judgment that the claims of the United States

| Withholding and FICA taxes: | Pacific Ins. Adm. Agency, Inc. | Pacific Ins. Adm., Inc. |
|---|---|---|
| 4th Quarter 1982 | | |
| Interest to 11–7–84 | | $ 35.54 |
| Penalty to 11–7–84 | | 155.60 |
| 1st quarter 1983 | $ 1,996.68 | 4,386.85 |
| Interest to 11–7–84 | 491.33 | 904.69 |
| Penalty to 11–7–84 | 641.85 | 637.95 |
| *Corporate Income Taxes:* | | |
| 1983 income tax | 9,690.00 | 57,154.00 |
| Interest to 11–7–84 | 1,726.06 | 9,059.59 |
| Penalty to 11–7–84 | 1,698.26 | 4,572.32 |
| 1984 Income Tax | 6,412.00 | 9,728.00 |
| Interest to 11–7–84 | 225.77 | 353.31 |
| Penalty to 11–7–84 | 512.24 | 777.56 |
| *Federal Unemployment Taxes:* | | |
| 1983 unemployment tax | 1,812.24 | 616.21 |
| Interest to 11–7–84 | 164.35 | 55.38 |
| Penalty to 11–7–84 | 143.42 | 45.26 |

2. The text of § 41–3342 is reproduced as Exhibit A to this opinion.

3. The text of § 3713 states:
§ 3713. Priority of Government claims
(a)(1) A claim of the United States Government shall be paid first when—
(A) a person indebted to the Government is insolvent and—
(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
(ii) property of the debtor, if absent, is attached; or
(iii) an act of bankruptcy is committed; or
(B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.
(2) This subsection does not apply to a case under title 11.
(b) A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

are Class 5 claims and that he has no personal liability under the FIS for payment of any claims ahead of those of the United States. The Director deposited $75,000 in the registry of the District Court. In its answer, the United States asserted priority for the taxes due under the FIS, requested judgment against the Director for the amount of unpaid taxes, and sought an order that the interpled funds be paid over to the United States.

The case was submitted to the District Court on stipulated facts. On behalf of the United States, the IRS contended that the FIS governed the priority of the tax debts and, therefore, it was entitled to payment ahead of the Class 4 claimants. On behalf of the State of Idaho, the Director contended that state law controlled the priority of the federal government's claims due to provisions of the McCarran-Ferguson Act. Specifically, 15 U.S.C. § 1012(b) provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." [4]

The District Court concluded that state law does apply and that § 41–3342 governs the priority of the tax debts due to the United States. The court reasoned that § 41–3342 is part of the Idaho Insurance Code, a general regulatory scheme in the State of Idaho which regulates the state's insurance industry "from cradle to grave." In light of this analysis, the District Court concluded that § 41–3342's framework for

handling the priority of claims against insolvent insurers was regulation of the "business of insurance" within the meaning of the McCarran-Ferguson Act; accordingly, the FIS did not apply. The IRS now appeals.

DISCUSSION.

(A) *Standard of Review:*

■ Whether the Idaho statute in question is a law regulating the business of insurance within the meaning of the McCarran-Ferguson Act is a question of law. As such, it is reviewed *de novo. Keith v. Volpe,* 833 F.2d 850, 854 (9th Cir.1987) ("[A]ny elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable de novo"), *quoting Hall v. Bolger,* 768 F.2d 1148, 1150 (9th Cir.1985).

(B) *Overview of the Issue:*

This case presents a clear conflict between the Idaho Insurance Code, § 41–3342, and the FIS, 31 U.S.C. § 3713. The scope of the conflict warrants clarification. The IRS argues from two significantly different positions in this appeal. On the one hand, the IRS advances the narrow proposition that its claims simply have "priority ahead of that accorded the Class 4 claimants." *Excerpt of Record* ("ER") at 17 (*Stipulation of Facts* at 3, filed June 30, 1986). *See also Brief for Appellants* at 25 ("[T]he priority dispute here concerns only the claims of the United States and those of Class 4 creditors, the vast majority of

---

**4.** In relevant part, the McCarran-Ferguson Act states as follows:

§ 1011. Declaration of Policy

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

§ 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948

(a) State regulation

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation

No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C. § 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

which are merely general creditors.") If we were to decide the appeal on this narrow basis, we would not reach the issue of whether payment of claims in Classes 1 through 3 properly precedes satisfaction of the insolvents' obligations to the United States.

On the other hand, throughout its brief and oral argument, the IRS advanced the view that it is "inconceivable that Congress could have intended in enacting the McCarran-Ferguson Act to allow states to dictate the priority of federal claims on the insolvency of an insurance company." *Id.* at 8. Thus, not merely Class 4 claims but all claims of any nature would be subordinated to the federal government's claim because "[t]he McCarran-Ferguson Act has no effect on the Federal Insolvency Statute." *Id.* at 6.

Although the IRS' characterization of this case as a narrowly framed dispute between general creditors (in Class 4) and the United States (in Class 5) is plausible, we find that the issue on appeal must be stated more broadly. The First Amended Complaint filed on December 31, 1985, seeks a determination whether the IRS' claim properly is treated as a Class 5 claim "or as a Class 1 claim pursuant to 31 U.S.C. § 3713." In other words, the relief sought raises the issue whether the FIS supersedes § 41–3342 in its entirety, not simply whether, within the scheme Idaho has erected by § 41–3342, the United States deserves a higher peg on the priority chart than general creditors. Consistent with this request for relief, the District Court concluded that "[b]y virtue of the application of the McCarran-Ferguson Act ... 31 U.S.C. § 3713 does not supersede Idaho [Insurance] Code § 41–3342." ER at 12 (Order of District Court, filed May 4, 1987). Thus, in resolving the question of the IRS' ability to obtain satisfaction of the insolvents' outstanding tax obligations, we must determine whether the entire priority arrangement of Idaho Insurance Code § 41–3342 supersedes the FIS. In turn, the question of which statute controls hing-es on whether § 41–3342 is a law regulating the business of insurance within the contemplation of the McCarran-Ferguson Act.

### (C) *The McCarran-Ferguson Act:*

In 1869, the Supreme Court ruled that the issuance of "a policy of insurance is not a transaction of commerce." *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1869). Prior to the enactment of the McCarran-Ferguson Act, Congress reflected its agreement with the ruling in *Paul* by leaving the regulation of insurance transactions entirely to the States. *See Securities and Exchange Com'n v. National Securities, Inc.,* 393 U.S. 453, 458–59, 89 S.Ct. 564, 567–68, 21 L.Ed.2d 668 (1969) (discussing legislative history of McCarran-Ferguson Act). This prevailing view was abruptly shaken in 1944 when the Supreme Court decided *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 wherein the Court concluded that insurance transactions were "commerce" subject to federal regulation—in particular the federal antitrust laws. *See* 322 U.S. at 560–62, 64 S.Ct. at 1177–78.[5]

Even before the ink had dried on the *South-Eastern Underwriters* opinion, Congress moved to protect insurance companies from federal regulation. Declaring that "the continued regulation and taxation by the several States of the business of insurance is in the public interest," 15 U.S.C. § 1011, Congress passed the McCarran-Ferguson Act. The intent of Congress is evinced in the following passage of the law's legislative history:

> Inevitable uncertainties which followed the handing down of the decision in the *Southeastern [sic] Underwriters Association* case, with respect to the constitutionality of State laws, have raised questions in the minds of insurance executives, State insurance officials, and others as to the validity of State tax laws as

---

5. A House Report later referred to *South-Eastern Underwriters* as a "precedent-smashing decision." H.R.Rep. No. 143, 79th Cong., 1st Sess. 2–3, *reprinted in* 1945 U.S.Code Cong. & Ad. News 670, 671.

well as State regulatory provisions; thus making desirable legislation by the Congress to stabilize the general situation.

.    .    .    .    .

The purpose of the bill is twofold: (1) To declare that the continued regulation and taxation by the several States of the business of insurance is in the public interest; and (2) to assure a more adequate regulation of this business in the States by suspending the application of the Sherman and Clayton Acts....

H.R.Rep. No. 143, 79th Cong., 1st Sess. 2–3, *reprinted in* 1945 U.S.Code Cong. & Ad.News 670, 671–72. *Accord* S.Rep. No. 20, 79th Cong., 1st Sess. 1–2 (1945).

Given this specific legislative intent, both Congress and the courts have declared that the McCarran-Ferguson Act was not intended to open new areas of regulatory discretion to the States, but rather to return the realm of insurance transactions to the *status quo ante.* Hence, the House Report states that "[i]t is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern [sic] Underwriters Association* case." H.R.Rep. No. 143, 79th Cong., 1st Sess. 3 (1945), *reprinted in* 1945 U.S.Code Cong. & Ad.News 671. Drawing upon the foregoing language, the Supreme Court has concluded that the McCarran-Ferguson Act "was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." *National Securities,* 393 U.S. at 459, 89 S.Ct. at 568. Hence the law provides that states alone may regulate the "business of insurance." Over the years, the challenge for courts has been faithfully to distinguish this activity from the regulation of the business of insurers.

(D) *The Regulation of Insolvent Insurance Companies:*

For at least this century, Congress has excluded insurance companies from the provisions of the federal bankruptcy laws. Insurance companies, municipalities, railroads, banks, and building and loan associations were not subject to the Bankruptcy Act of July 1, 1898. 11 U.S.C. § 22(a) (West 1979). The new Bankruptcy Code enacted in 1978 continues the tradition by excluding insurance companies (among others) from subjugation to proceedings under chapters 7 or 11 of the Bankruptcy Code. 11 U.S.C. § 109 (West 1979 Supp. 1988). As a result of this historical exclusion, courts have maintained that the proper procedures and rules for "dismemberment" of insurance companies "is a question as to which the Supreme Court of [each] state will speak with ultimate authority." *Clark v. Williard,* 292 U.S. 112, 123, 54 S.Ct. 615, 620, 78 L.Ed. 1160 (1934) (Cardozo, J.).

Thus, federal courts have been reluctant to intrude in state proceedings, adhering to the view that whether it be liquidation or reorganization, the handling of the affairs of insolvent insurance companies is a responsibility retained by the states. *See, e.g., Motlow v. Southern Holding & Securities Corp.,* 95 F.2d 721, 725–26 (8th Cir.), *cert. denied,* 305 U.S. 609, 59 S.Ct. 68, 83 L.Ed. 388 (1938) (like any other corporation, liquidation of insurance companies is best performed by a single entity possessing title, custody, and control of all assets; vis-a-vis insurers, Congress has left that authority in the states); *Levy v. Lewis,* 635 F.2d 960, 963–64 (2d Cir.1980) (quoting *Motlow* and stating that "the administrative and judicial scheme erected by New York to regulate insurance companies, including that part enabling the institution and implementation of liquidation proceedings, operates pursuant to an express federal policy of noninterference in insurance matters); *Universal Marine Ins. Co., Ltd. v. Beacon Ins. Co.,* 768 F.2d 84, 88 (4th Cir.1985) ("Reorganization of insolvent insurance companies is a matter of state law and is handled through insolvency proceedings in state court."); *Blackhawk Heating & Plumbing Co., Inc. v. Geeslin,* 530 F.2d 154, 159 (7th Cir.1976) ("The states have a paramount interest in seeing that liquidation proceedings conducted by court-ap-

pointed liquidators and overseen by their courts are free from [federal] interference.")

Notwithstanding the normally preemptive labyrinth that is the Bankruptcy Code, then, Congress has assigned the States the virtually autonomous role of ministering to their own insolvent insurance companies. Yet that assignment is not a *carte blanche* for state's to legislate vis-a-vis insurance companies. At all times, States are constrained by the Constitution, particularly with respect to areas of authority conferred on Congress by the People through the Constitution. For example, as a result of the Commerce Clause, Congress has a mandate to enhance the general welfare of the nation by the regulation and promotion of interstate commerce. The assignment of this responsibility to the States is possible, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339–40, 102 S.Ct. 1096, 1100–01, 71 L.Ed.2d 188 (1982) ("It is indeed well settled that Congress may use its powers under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy,'"), *quoting Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980), but, as in the case of the McCarran-Ferguson Act, such a delegation is to be "narrowly construed in the face of valid federal regulatory interests." *Cochran v. Paco Inc.*, 606 F.2d 460, 467 (5th Cir.1979); *accord United States v. Title Ins. Rating Bureau of Arizona*, 700 F.2d 1247, 1249 (9th Cir.1983) (the McCarran-Ferguson Act "is to be narrowly construed"), *cert. denied*, 467 U.S. 1240, 104 S.Ct. 3509, 82 L.Ed.2d 819.

■ The enforcement of tax obligations pursuant to Article I § 8 of the Constitution represents a similar type of valid and compelling federal regulatory interest that militates against the diminution or supersession of federal authority. The fact that the FIS has been the law of the land for

nearly two hundred years testifies to the primacy and constancy of this interest. *See* Act of March 3, 1797, ch. 20, 1 Stat. 512, 515, Sec. 5 (4th Cong., 2d Sess.), amended by Act of March 2, 1799, ch. 22, 1 Stat. 627, 676, Sec. 65 (5th Cong., 3d Sess.).[6] For historical background, see *United States v. Emory*, 314 U.S. 423, 426–28, 62 S.Ct. 317, 319–20, 86 L.Ed. 315 (1941) ("The purpose of this section is 'to secure adequate public revenues to sustain the public burden' [citation omitted], and it is to be construed liberally in order to effectuate that purpose [citation omitted]."). Quite appropriately, then, Congress has explicitly delimited the scope of state prerogatives with respect to the regulation of insurance. In particular, state authority to regulate its insolvent insurers free from preemption by general federal statutes necessarily is qualified by the requirement that the regulation must relate to the "business of insurance."

(E) *Construction of the Phrase "Business of Insurance":*

(i) *The Securities and Exchange Com'n v. National Securities Case.*

The seminal case construing the McCarran-Ferguson Act's phrase, the "business of insurance," is *Securities and Exchange Com'n v. National Securities*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). In that case, the Court confronted an Arizona statute aimed at protecting stockholders in insurance companies. A panel of this court had found that the statute superseded the federal securities laws (because it regulated the "business of insurance" within the meaning of the McCarran-Ferguson Act), and hence immunized conduct that was allegedly violative of the anti-fraud provisions of the Securities Exchange Act of 1934.

The key to the Supreme Court's analysis in *National Securities* was the Court's construction of the term "business of insur-

---

**6.** In 1982, Congress amended the FIS (formerly R.S. 3466 31 U.S.C. § 191) at 31 U.S.C. § 3713. Act of September 13, 1982, Pub.L. No. 97–258, 96 Stat. 972, Sec. 1. No substantive changes were made in the statute. Congress merely amended the language of the statute to reflect contemporary usage. *See* H.R.Rep. No. 97–651, 97th Cong. 2d Sess. 1, 3–4 130–35 *reprinted in* 1982 U.S.Code Cong. & Ad.News 1895, 1896–1898, 2024–29.

ance." At the outset, the Court noted that the legislative history "shed[s] little light on the meaning of the words 'business of insurance'." 393 U.S. at 459, 89 S.Ct. at 568. Nevertheless, the Court found it "relatively clear what problems Congress was dealing with." *Id.* After reviewing the intent of Congress in passing the law, the Court went on to state:

> Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* [8 Wall. 168, 19 L.Ed. 357 (1869)] held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

*Id.* 393 U.S. at 460, 89 S.Ct. at 568.

Applying this reasoning to the statute before it, the Court in *National Securities* found the Arizona statute outside the scope of the McCarran-Ferguson Act. The Arizona statute did not regulate the "insurance" relationship, but rather the relationship between a stockholder and the company in which the investor held stock. Such a law, said the Court, "is not insurance regulation, but securities regulation." *Id.* To the objection that the statute applied only to insurance companies, the Court tersely replied that "mere matters of form need not detain us," *id.*, and went on to state:

> The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies. Such regulation is not

within the scope of the McCarran–Ferguson Act.

*Id.*

### (ii) *Application of National Securities to this Case:*

■ Application of the holding and reasoning of *National Securities* to this case leads to the conclusion that Idaho Insurance Code § 41–3342 is *not* a law regulating the business of insurance. To begin with, the statute deals with insurance companies that no longer are in the business of insurance. The only "business" being conducted is the liquidation of a corporation which happens to have been an insurance company. Hence, the scope of the net cast by the statute is wholly unrelated to the relationship between insurer and insured. The insurer has ceased to exist. The only relationship is between the insureds and the government official charged with overseeing the liquidation of the insolvents. Whereas the Court in *National Securities* found that in legislating the McCarran-Ferguson Act Congress focused on the relationship between insurer and insured, 393 U.S. at 460, 89 S.Ct. at 568, the Idaho statute speaks to an entirely different concern in this context: the relationship between debtor and creditor. The relationship regulated by § 41–3342 that is at issue in this case is between the liquidated assets of corporations and the claims of various creditors.

Furthermore, only by a great stretch of imagination can it be said that the priority scheme erected by § 41–3342 relates closely to the insurer's status as a "reliable insurer[ ]." *National Securities*, 393 U.S. at 460, 89 S.Ct. at 568. Once rendered insolvent and placed in the hands of a liquidator, an insurance company no longer is involved in risk protection, nor is there anything that a liquidator could do to make the defunct entity a reliable insurer. In such a situation, the state is no longer regulating the traditional business of insurance, and, thus, has exceeded the boundaries within which the McCarran—Ferguson Act frees it from preemption by general federal statutes. This conclusion is buttressed by the admonition, drawn from the

opinion in *National Securities,* that the exemption "is for the 'business of insurance,' not the 'business of insurers.'" *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979), *citing National Securities,* 393 U.S. at 459–60, 89 S.Ct. at 568.

On the basis of the *National Securities* case, it is tolerably clear that Idaho Insurance Code § 41–3342 is not a law regulating "the business of insurance" within the meaning of the McCarran-Ferguson Act and therefore the statute is superseded by the FIS.

### (iii) *A Second Level of Analysis:*

In assessing the meaning of "business of insurance" within the context of the McCarran-Ferguson Act, the parties devote much attention to two Supreme Court cases decided after *National Securities.* The first case is *Group Life & Health Ins. Co. v. Royal Drug Co., Inc.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), a dispute involving a price-fixing scheme in Texas between the Blue Shield health plan and pharmacies providing drugs to Blue Shield policyholders. The second case is *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), which involved an insurance company's use of an independent source to evaluate claims made for chiropractic treatments. The relevance of both cases is that in each the Supreme Court used a three-prong test to ascertain the meaning of the phrase "business of insurance."

Although ostensibly appearing to speak to the precise issue raised here, neither *Royal Drug* nor *Pireno* are necessary to decide this case. Both cases are refinements of the seminal analysis of *National Securities* tailored to address activities of insurance companies that would implicate the antitrust laws in the absence of the McCarran-Ferguson Act.

In light of the insurers' insolvency and liquidation, there is no activity of an insurance company to be assessed. The companies have ceased to exist. This is underscored by the parties' omission of discussion regarding the nature of the claims of the general creditors in Class 4. For example, in what capacity did the insurers incur the debts owed to each general creditor? The reason that the parties properly ignore this issue is because the nature of the insurance companies' "activities" is a moot question. Their activities have ceased just as they themselves have ceased to exist— leaving behind a finite pool of assets which the State of Idaho seeks to distribute according to its own plan. This is distinct from any "business of insurance" situation envisioned by the McCarran-Ferguson Act.

The second reason why the two cases need not be reached is that the tripartite analysis developed in *Royal Drug* and followed in *Pireno* focused on contracts entered into by insurers directly or indirectly implicating policyholders. Idaho cannot offer a colorable argument to the effect that the general creditors in Class 4 or that the IRS' claims in Class 5 implicate policyholders. By the time these classes of claims are reached, all policyholders' claims will have been satisfied. Even with respect to policyholders in Class 3, their status is most aptly described as "debtors" because the policy relationship has been terminated. Finally, claims in Classes 1 and 2 obviously are unrelated to the insurer-insured relationship. Consequently, this case does not even rise to the level of doubt present in either *Royal Drug* or *Pireno.* *National Securities* and the legislative history alone are enough to decide this case without the three prongs of *Royal Drug.*

### (iv) *The Application of the Royal Drug Test:*

If we were to examine the facts here in the light of the factors enumerated in *Royal Drug,* it is clear that § 41–3342 would not pass muster as a law regulating the business of insurance. *Royal Drug* identified three characteristics of the business of insurance that Congress intended to exempt through the McCarran-Ferguson Act. These characteristics were summarized in *Pireno* as follows:

[F]irst, whether the practice has the effect of transferring or spreading a poli-

cyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.

458 U.S. at 129, 102 S.Ct. at 3009.

Idaho Insurance Code § 41–3342 does not satisfy any of the tests articulated by the Supreme Court to determine whether a particular practice falls within the ambit of the "business of insurance." The statute's assignment of priority to some creditors as against governmental entities does not transfer or spread policyholder risk. In clarifying the content of the first prong of the *Royal Drug* test, the Supreme Court has stated that the "spreading" and "underwriting" of policyholder's risk denoted in *Royal Drug* relates to the "transfer of risk characteristic of insurance." *Pireno*, 458 U.S. at 130, 102 S.Ct. at 3009. As explained in *Pireno*, that risk is transferred "by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered." *Id.*[7] Consequently, the statute does not speak to "policyholder risk" as defined in Supreme Court jurisprudence.

Nor does the statute play an integral role in the insurer-insured policy relationship for, as stated above, the insurer has ceased to exist by the time this statute comes into play. What the statute does address is the relationship between those left in the lurch by the expiration of the insurer. As among these creditors, the statute purports to establish priorities which relegate government agencies, in particular, taxing authorities, to a subordinated position in terms of the collection of the debt owed by the insured.

Finally, the statute is not limited in effect to entities solely within the insurance industry. Creditors of all varieties have their claims assigned priorities by the statute, including the local, state, and federal governments. Thus, § 41–3342 fails to satisfy even a single prong of the test developed by the Supreme Court to ascertain whether a given practice or contract can be considered to regulate the business of insurance.

The United States Court of Appeals for the Fourth Circuit recently reached this same conclusion with respect to a Maryland statute purporting to assign less than foremost priority to claims of the United States against the estate of an insolvent insurance company. In *Gordon v. United States Department of the Treasury*, 846 F.2d 272 (4th Cir.1988) (per curiam), the Fourth Circuit adopted with only modest elaboration the opinion of the district court concluding that none of the *Royal Drug* factors was met by a Maryland claim-priority statute. *See* 668 F.Supp. 483, 490–91 (D.Md.1987); *see also Langdeau v. United States*, 363 S.W.2d 327, 331 (Tex.Civ.App.1962) ("This is not a regulation of the insurance business; it is a priority established for a class of creditors of an insurance company.") The decision in *Gordon* simply bolsters our view of this case.

### (F) *Clarification of Remaining Issues:*

This section briefly addresses other objections and points raised by the State of Idaho.

One flaw that ran throughout the State of Idaho's brief and oral argument is its insistence on viewing the statute as a whole. Idaho believes that we should not look only at § 41–3342 to decide the case, but should examine the entire statutory scheme erected by Idaho Insurance Code. There are several problems with this suggestion, the most obvious of which is that it begs the question. When considered as a

---

7. By analogy, the Supreme Court squarely has rejected the argument offered by Idaho that payment of unsettled claims by means of assets from the insolvents' estates is a form of risk spreading. In *Pireno* the Court observed:

Petitioner's argument contains the unspoken premise that the transfer of risk from an insured to his insurer actually takes place not when the contract between those parties is completed, but rather only when the insured's claim is settled. This premise is contrary to the fundamental principle of insurance that the insurance policy defines the scope of risk assumed by the insurer from the insured. [citations omitted]

458 U.S. at 131, 102 S.Ct. at 3009–10.

whole, obviously the statute does seek to regulate the business of insurance; but the question is whether this specific provision constitutes the type of regulation that Congress sought to protect from indirect federal preemption by passing the McCarran-Ferguson Act. If Idaho's approach was correct, the Supreme Court could not have decided *National Securities* as it did, because the Court would have had to accept the Arizona provision as part of a statute which undeniably regulated the business of insurance.

The second point raised by Idaho is that *Royal Drug* and *Pireno* are factually distinct from this case. As indicated above, we agree with this assessment. Both *Royal Drug* and *Pireno* dealt with insurance company activities implicating the antitrust laws, whereas this case involves a state statute and a state liquidator acting in contravention of a federal debt statute. Whereas Idaho is correct that the contracts and insurer-insured relationships involved in *Royal Drug* and *Pireno* distinguish them from this case, this only serves to underscore the implausibility of the State's position. The point of all three of the aforementioned Supreme Court cases is that the McCarran-Ferguson Act sought to exempt laws which regulate actions of insurance companies involving insurance policies. The insurance contract is truly at center stage. Yet, at base § 41–3342 does not speak to insurance contracts; instead, it instructs a liquidator how to act when distributing the assets of a corporation that once sold insurance.

Finally, Idaho argues that the elements necessary to trigger the application of the FIS are not present. The State's argument is frivolous. The State Director of Insurance filed this interpleader action precisely because the two companies lacked funds sufficient to satisfy their outstanding obligations. This satisfies subpart (a)(1)(B) of the FIS which states that the United States shall be paid first when a person is insolvent and his estate, in the custody of an administrator, is inadequate to satisfy all outstanding debts. In addition, subpart (a)(1)(A)(i) of the statute is satisfied by the companies' stipulation acknowledging insolvency and voluntarily transferring their assets to the Director for purposes of liquidation. The FIS is clearly implicated.

CONCLUSION.

Idaho Insurance Code § 41–3342 is not a law regulating the "business of insurance" within the contemplation of the McCarran-Ferguson Act. Therefore, the Federal Insolvency Statute controls and the United States is entitled to receive full payment of the insolvents' obligations prior to satisfaction of the obligations of other creditors. We reverse the District Court's decision, vacate the judgment, and remand the case for distribution of the remaining assets in a fashion consistent with the FIS, 31 U.S.C. § 3713.

REVERSED AND REMANDED.

### EXHIBIT A

Idaho Code Section 41–3342:

41–3342. Priority of distribution.—The priority of distribution of claims from the insurer's estate shall be in accordance with the order in which each class of claims as herein set forth. Every claim in each class shall be paid in full or adequate funds retained for such payment before the members of the next class receive any payment. No subclasses shall be established within any class. The order of distribution of claims shall be:

(1) Class 1. The costs and expenses of administration, including, but not limited to, the following:

(a) The actual and necessary costs of preserving or recovering the assets of the insurer; (b) Compensation for all services rendered in the liquidation; (c) Any necessary filing fees; (d) The fees and mileage payable to witnesses; (e) Reasonable attorney's fees; and (f) The reasonable expenses of a guaranty association or foreign guaranty association in handling claims.

(2) Class 2. Debts due to employees for services performed and benefits accrued to the extent that they do not exceed one thousand dollars ($1,000) and represent payment for services performed within one (1) year before the

commencing of delinquency proceedings. Officers and directors shall not be entitled to the benefit of this priority. Such priority shall be in lieu of any other similar priority which may be authorized by law as to wages or compensation of employees.

(3) Class 3. All claims under policies for losses incurred, including third party claims, all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies, and all claims of a guaranty association or foreign guarantee association. All claims under life and annuity policies, whether for death proceeds, annuity proceeds, or investment values shall be treated as loss claims. That portion of any loss, indemnification for which is provided by other benefits or advantages recovered by the claimant, shall not be included in this class, other than benefits or advantages recovered or recoverable in discharge of familial obligations of support or by way of succession at death or as proceeds of life insurance, or as gratuities. No payment by an employer to his employee shall be treated as a gratuity.

(4) Class 4. Claims under nonassessable policies for unearned premium of [*sic.*] other premium refunds and claims of general creditors.

(5) Class 5. Claims of the federal or any state or local government. Claims, including those of any governmental body for a penalty or forfeiture, shall be allowed in this class only to the extent of the pecuniary loss sustained from the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby. The remainder of such claims shall be postponed to the class of claims under subsection (8) of this section.

(6) Class 6. Claims filed late or any other claims other than claims under subsections (7) and (8) of this section.

(7) Class 7. Surplus or contribution notes, or similar obligations, and premium refunds on assessable policies. Payments to members of domestic mutual insurance companies shall be limited in accordance with law.

(8) Class 8. The claims of shareholders or other owners.